1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   REX CHAPPELL,

11             Plaintiff,              No. CIV S-04-1183 LKK DAD P

12       vs.

13   C.K. PLILER, et al.,

14             Defendants.             FINDINGS AND RECOMMENDATIONS

15   _____/

16             Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  Pending before the court is a motion for summary judgment

18   brought on behalf of defendants Goughnour, Plier, Rosario, Stiles, and Vance pursuant to Rule

19   56 of the Federal Rules of Civil Procedure.  Plaintiff has filed an opposition to the motion.

20   Defendants have not filed a reply.

21                                **BACKGROUND**

22             Plaintiff is proceeding on his original complaint.  Therein, he alleges as follows.

23   On January 4, 2002, prison officials at CSP-Sacramento placed the facility on lockdown

24   following a violent incident in the dining hall between Southern Mexican inmates and

25   correctional staff.  During the extended lockdown that resulted, he was not allowed outdoor

26   exercise time, canteen privileges, quarterly packages, or visitation.  In addition, prison officials

                                      1

1   issued a memorandum stating that all tobacco products would be considered contraband in 30

2   days.  On two separate occasions during the lockdown, his attorney attempted to visit him but

3   prison officials denied him the right to see him.  Prison officials also denied plaintiff access to

4   the law library.  According to plaintiff, as a result of this lockdown he had virtually no

5   permissible out-of-cell activity from January 2002 to August 2002.  (Compl. at 1-7.)

6          Plaintiff claims that the defendants denied him outdoor exercise and access to the

7   canteen for more than eight months in violation of the Eighth Amendment.  In addition, he

8   claims that the defendants interfered with his right of access to the courts by denying him visits

9   with his attorney and access to the law library in violation of the First Amendment.  Plaintiff also

10  claims that defendants denied him equal protection and due process by imposing lockdown

11  conditions on him while allowing privileges to those designated "critical workers" in violation of

12  the Fourteenth Amendment.  Finally, plaintiff claims that defendants violated California Penal

13  Code § 825(b) and California Code of Regulations Title 15, § 3175.  Plaintiff requests monetary

14  damages.  (Compl. at 12-17.)

15                 **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

16          Summary judgment is appropriate when it is demonstrated that there exists "no

17  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

18  matter of law."  Fed. R. Civ. P. 56(c).

19          Under summary judgment practice, the moving party
            always bears the initial responsibility of informing the district court
20          of the basis for its motion, and identifying those portions of "the
            pleadings, depositions, answers to interrogatories, and admissions
21          on file, together with the affidavits, if any," which it believes
            demonstrate the absence of a genuine issue of material fact.

22

23  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

24  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

25  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

26  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.  477 U.S. at 322.  "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for entry of summary

judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

       If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

1436 (9th Cir. 1987).

       In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

/////

1  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2  committee's note on 1963 amendments).

3          In resolving the summary judgment motion, the court examines the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

6  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

7  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

8  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

10 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

11 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12 show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

13 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

15         On February 2, 2006, the court advised plaintiff of the requirements for opposing

16 a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

17 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

18 **OTHER APPLICABLE LEGAL STANDARDS**

19 I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

20         The Civil Rights Act under which this action was filed provides as follows:

21     Every person who, under color of [state law] . . . subjects, or causes
       to be subjected, any citizen of the United States . . . to the
22     deprivation of any rights, privileges, or immunities secured by the
       Constitution . . . shall be liable to the party injured in an action at
23     law, suit in equity, or other proper proceeding for redress.

24 42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

25 actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

26 Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

                                                4

1   (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

2   meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

3   omits to perform an act which he is legally required to do that causes the deprivation of which

4   complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

5            Moreover, supervisory personnel are generally not liable under § 1983 for the

6   actions of their employees under a theory of respondeat superior and, therefore, when a named

7   defendant holds a supervisorial position, the causal link between him and the claimed

8   constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

9   (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

10  allegations concerning the involvement of official personnel in civil rights violations are not

11  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

12  II.  Eighth Amendment and Denial of Outdoor Exercise and Personal Hygiene Items

13           The Eighth Amendment prohibits the infliction of "cruel and unusual

14  punishments."  U.S. Const. amend. VIII.  The "unnecessary and wanton infliction of pain"

15  constitutes cruel and unusual punishment prohibited by the United States Constitution.  Whitley

16  v. Albers, 475 U.S. 312, 319 (1986); see also Ingraham v. Wright, 430 U.S. 651, 670 (1977);

17  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  Neither accident nor negligence constitutes cruel

18  and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good

19  faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."

20  Whitley, 475 U.S. at 319.

21           What is needed to show unnecessary and wanton infliction of pain "varies

22  according to the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S.

23  1, 5 (1992) (citing Whitley, 475 U.S. at 320).  However, to prevail on an Eighth Amendment

24  claim, the plaintiff must show that objectively he suffered a "sufficiently serious" deprivation.

25  Farmer, 511 U.S. at 834; Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  The plaintiff must also

26  /////

1   show that subjectively each defendant had a culpable state of mind in allowing or causing the

2   plaintiff's deprivation to occur.  Farmer, 511 U.S. at 834.

3           It is well established that inmates have a constitutional right to outdoor exercise

4   under the Eighth Amendment.  See LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993).

5   Long-term denial of outdoor exercise is unconstitutional.  See Spain v. Procunier, 600 F.2d 189

6   (9th Cir. 1979).  However, "prison officials are authorized and indeed required to take

7   appropriate measures to maintain prison order and discipline and protect staff and other

8   prisoners. . . ."  LeMaire, 12 F.3d 1458; Hayward v. Procunier, 629 F.2d 599 (9th Cir. 1980)

9   (five-month lockdown did not violate Eighth Amendment in light of state of emergency).

10          It is also well established that inmates have a constitutional right to access

11  personal hygiene items under the Eighth Amendment.  See Keenan v. Hall 83 F.3d 1083, 1091

12  (9th Cir. 1996).  Prison officials must provide inmates with basic human needs, including

13  sanitation.  See Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  However, the

14  routine discomfort inherent in the prison setting is inadequate to satisfy the objective prong of an

15  Eighth Amendment inquiry.  Only those deprivations denying "the minimal civilized measure of

16  life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation."

17  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

18  III.  First Amendment and Denial of Access to Courts

19          "Prisoners have a constitutional right of access to the courts."  Bounds v. Smith,

20  430 U.S. 817, 821 (1977).  Such access must be adequate, effective, and meaningful.  Id. at 822.

21  Prisons officials must provide inmates with adequate law libraries or adequate assistance from

22  persons who have training in the law.  Id. at 828.  However, a plaintiff claiming denial of access

23  to the courts must show more than an inadequate law library or legal assistance program in the

24  theoretical sense.  The plaintiff must show that he suffered an "actual injury" as a result of the

25  alleged inadequacies at the prison or that defendants hindered his attempt to pursue his legal

26  claims.  See Lewis v. Casey, 518 U.S. 343, 349 & 351 (1996).

1          The United States Constitution does not require the maximum or even an optimal

2   level of access to the courts.  See Sands v. Lewis, 886 F.2d 1166, 1169 (9th Cir. 1989).  Nor does

3   the Constitution guarantee inmates unlimited access to the library.  See Lindquist v. Idaho State

4   Bod. of Corrs., 776 F.2d 851, 858 (9th Cir. 1985).  Prison officials may regulate the time, place,

5   and manner in which prisoners use library facilities, so "[t]he fact that an inmate must wait for a

6   turn to use the library does not necessarily mean that he has been denied meaningful access to the

7   courts."  Id.

8          If a prisoner asserts a backward-looking claim for denial of access to the courts

9   and seeks a remedy for a lost opportunity to present a claim, he must allege three elements.  First,

10  he must identify a "nonfrivolous" "arguable" underlying claim.  Second, he must describe the

11  official acts that frustrated the underlying litigation.  Finally, he must identify a remedy that is not

12  otherwise available in a future suit.  See Christopher v. Harbury, 536 U.S. 403, 415 (2002)

13  (discussing the elements of forward-looking and backward-looking access to courts claims);

14  Phillips v. Hust, 477 F.3d 1070, 1076 (9th Cir. 2007) (discussing the elements of backward-

15  looking access to courts claims), vacated on other grounds by, ___U.S.___, 129 S. Ct. 1036

16  (2009).

17  IV.  Qualified Immunity

18          "Government officials enjoy qualified immunity from civil damages unless their

19  conduct violates 'clearly established statutory or constitutional rights of which a reasonable

20  person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

21  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

22  immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

23  the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

24  statutory or constitutional right and (2) whether the right at issue was "clearly established."

25  Saucier v. Katz, 533 U.S. 194, 201 (2001).

26  /////

1    Although the court was once required to answer these questions in order, the

2 United States Supreme Court has recently held that "while the sequence set forth there is often

3 appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, ___ U.S. ___,

4 ___, 129 S. Ct. 808, 818 (2009).  In this regard, if a court decides that plaintiff's allegations do

5 not make out a statutory or constitutional violation, "there is no necessity for further inquiries

6 concerning qualified immunity." Saucier, 533 U.S. at 201.  Likewise, if a court determines that

7 the right at issue was not clearly established at the time of the defendant's alleged misconduct,

8 the court may end further inquiries concerning qualified immunity at that point without

9 determining whether the allegations in fact make out a statutory or constitutional violation.

10 Pearson, 129 S. Ct. at 818-21.

11    In deciding whether the plaintiff's rights were clearly established, "[t]he proper

12 inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

13 unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

14 gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

15 298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202).  The inquiry must be

16 undertaken in light of the specific context of the case.  Saucier, 533 U.S. at 201.  Because

17 qualified immunity is an affirmative defense, the burden of proof initially lies with the official

18 asserting the defense.  Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536 (9th

19 Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

20    **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

21 I. Defendants' Statement of Undisputed Facts and Evidence

22    Defendants' statement of undisputed facts is supported by citations to declarations

23 by defendants Vance and Pliler.  It is also supported by copies of CSP-Sacramento memoranda

24 regarding the program status of B-Facility, CSP-Sacramento incident reports, plaintiff's visiting

25 logs, plaintiff's movement history, and other internal CSP-Sacramento documents.

26 /////

1    The evidence submitted by the defendants establishes the following.  CSP-

2    Sacramento is a Level IV maximum security prison.  The inmates confined there are deemed to

3    pose the greatest threats to institutional security and safety of staff.  The facility is organized in

4    three identical sets of buildings – Facility A, B, and C.  Each facility is comprised of eight blocks

5    and each block consists of 64 cells and 128 beds.  In 2002, approximately 1,000 prisoners of all

6    races were confined in each of the three facilities.  Each facility is self-contained and built around

7    a yard where, absent unusual circumstances, inmates are allowed to exercise on a daily basis.  On

8    January 4, 2002, an inmate assault on staff began a two-year period of unprecedented violence at

9    CSP-Sacramento.  Inmate assaults on staff and ongoing ethnic and gang violence caused prison

10   administrators to intermittently suspend normal programming at the prison.  (Defs.' SUDF 5-10,

11   Defs.' Ex. B.)

12   Specifically, on January 4, 2002, Officer Haggard attempted to counsel inmate

13   Lopez about his behavior when Lopez attacked him.  Officer Casey responded to the incident.  In

14   addition, Officer Huggins attempted to calm four other inmates nearby who began pushing him

15   and striking the other officers.  Lopez then ran towards Officer Frasier and began slugging him

16   while additional inmates joined in the attack.  The inmates assaulted the officers and threw

17   objects at them.  The assault ended after correctional staff fired two 40 mm rounds.  A search of

18   the area uncovered two weapons.  (Defs.' SUDF 11, Defs.' Exs. B & C.)  Officers Casey,

19   Huggins, and Frasier suffered puncture wounds as a result of the attack, the type associated with

20   inmate-manufactured weapons.  Officer Haggard sustained injuries so severe that he had to be

21   hospitalized in the intensive care unit.  All of the officers were transported to and treated at

22   Mercy Hospital.  On the same day, prison officials declared a state of emergency and placed B-

23   Facility on lockdown.  During a lockdown, inmates are confined to their cells.  They are cell-fed

24   and allowed to exit their cells only for controlled showers.  (Defs.' SUDF 12-14, Defs.' Ex. B.)

25   On January 4, 2002, prison officials notified staff and inmates in B-Facility of the

26   program changes.  All programs were discontinued, including yard, showers, visiting, work and

9

education programs, canteen, telephone privileges, and religious services.  Inmates could forward

requests for legal materials to the librarian through housing unit staff.  Medical Technical

Assistants made rounds through the housing units, and inmates requiring emergency services

would be sent to the clinic for treatment and medication.  (Defs.' SUDF 15, Defs.' Ex. E.)

On January 8, 2002, inmates were allowed to shower.  Prison officials escorted

them in handcuffs one cell at a time with two escorts per inmate.  On January 10, 2002,

defendant Pliler authored a memorandum on inmate movement, requiring that all inmates be

placed in restraints when escorted within the facility.  Inmates in cells with "cuff ports" were

placed in handcuffs and escorted to and from the showers.  Inmates housed in units without "cuff

ports" were released one at a time without restraints.  Officers were not allowed into housing

units with unrestrained inmates.  In those instances, control booth officers controlled inmate

movement.  All inmates being escorted between facilities were in full restraints, including waist

chains and leg irons.  (Defs.' SUDF 16-17, Defs.' Ex. E.)

On January 18, 2002, prison officials lifted restrictions on attorney visits but kept

most of the remaining restrictions in effect.  On January 27, 2002, plaintiff met with his attorney,

Michael Rooney.  (Defs.' SUDF 18-19, Defs.' Exs. E & F.)

On January 22, 2002, inmates were allowed to exchange their dirty clothing for

clean clothing through their cell door tray slots on a weekly basis.  On February 4, 2002, inmates

could access the canteen and purchase up to two books of stamps, envelopes, stationary, pens,

and pencils.  On March 1, 2002, inmates could purchase personal hygiene items.  There were

limits, however, on the number of items an inmate could purchase to ensure that there was an

adequate supply for each inmate.  (Defs.' SUDF 20-21 & 23, Defs.' Ex. E.)

On March 8, 2002, critical workers in B-Facility were allowed to return to their

work assignments.  In addition, critical workers could exercise on the yard, have visits on

Saturdays and Sundays and also use the telephone.  Cell-feeding continued but with hot meals

served on trays.  Chaplains conducted rounds for inmates who wanted to receive religious

services at their cell doors.  Inmates assigned to mental health groups were ducated for treatment.
By March 19, 2002, critical workers could receive quarterly packages, have family visits and
participate in drug and alcohol support groups.  In addition, members of the Men's Advisory
Committee ("MAC") could exercise on the yard.  (Defs.' SUDF 24-25, Defs.' Ex. E.)

By March 27, 2002, all inmates could receive quarterly packages, and only
Hispanic inmates were required to be in restraints during escorts.  Critical workers could also
have regular access to the library and attend religious services in the chapel or sweat lodges.  In
addition, members of the MAC executive body could access the yard, the MAC office, and
housing areas during second watch.  (Defs.' SUDF 26-27, Defs.' Ex. E.)

By April 3, 2002, all inmates could exercise on the yard according to the regular
schedule.  In addition, all inmates except Hispanic inmates were allowed Saturday and Sunday
visiting.  (Defs.' SUDF 28, Defs.' Ex. E.)

On April 14, 2002, a correctional officer noticed considerable tension on the yard
between inmates belonging to the L.A. Crips gang, so prison officials began escorting them in
unrestrained small groups.  On April 15, 2002, a stabbing/slashing assault involving White
inmates occurred on the main exercise yard.  On the same day, prison officials discontinued work
and education groups, yard access, law library access, religious services, telephone privileges,
and family visits for Hispanic and White inmates and inmates belonging to the L.A. Crips gang.
Programming remained normal for all other inmates.  (Defs.' SUDF 29-30, Defs.' Ex. E.)

By May 1, 2002, less than four months after the lockdown began, programming
largely returned to normal for all but the Southern Hispanic inmates at CSP-Sacramento.  For
example, inmates were allowed yard privileges subject to an approved yard schedule.  (Defs.'
SUDF 31, Defs.' Ex. E.)

However, on May 8, 2002, a Black inmate stabbed Officer Tuter in the B-Facility
dining room, and prison officials declared another state of emergency.  Prison officials placed B-
Facility on lockdown and cancelled all programs for all inmates.  On May 31, 2002, Acting

Warden Rosario announced the state of emergency unlock criteria.  Only inmates without disciplinary reports for staff assault for five years, weapons possession for three years, participation in a riot or battery on an inmate for two years, or possession or under the influence of inmate-manufactured alcohol would be assigned to or allowed to work in a job assignment without consistent gun coverage.  (Defs.' SUDF 32-33, Defs.' Exs. E & G.)

By July 1, 2002, prison officials again began escorting inmates without restraints.  In addition, inmates were allowed visiting and telephone privileges, quarterly packages, and access to the canteen.  Three MAC members could also communicate with inmates from block to block.  On July 10, 2002, White, American Indian, and inmates classified as "Other" deemed critical workers were approved for tier tender assignments and were allowed two hours on the yard per day.  Southern Hispanic and Mexican National inmates were released to the mini-concrete exercise yards.  By July 16, 2002, prison officials were only escorting Black inmates.  Black inmates also had to resort to the paging system, while all other inmates could access the library.  (Defs.' SUDF 34-36, Defs.' Ex. E.)

On August 8, 2002, a White inmate was stabbed on the main exercise yard, and prison officials again suspended privileges for White inmates.  Black inmates continued on a limited program as well and were restricted to mini-concrete exercise yards.  On August 15, 2002, prison officials discovered that a significant amount of metal stock was missing from dining rooms 3 and 4 in B-Facility.  Because metal can be used to fashion inmate-manufactured weapons, prison officials suspended programs on B-Facility again.  (Defs.' SUDF 37-38, Defs.' Ex. E.)

On August 22, 2002, two incidents involving White and Hispanic inmates occurred on mini-concrete yards in B-Facility and resulted in numerous serious injuries to inmates.  Prison officials continued to suspend programs in B-Facility.  (Defs.' SUDF 39, Defs.' Ex. E.)

/////

1    On August 27, 2002, Black inmates and inmates classified as "Others" were

2  approved for work and education assignments, canteen access, religious services, and yard.

3  Programs remained suspended for other inmates in B-Facility.  On August 28, 2002, plaintiff was

4  transferred to Corcoran State Prison.  (Defs.' SUDF 2 & 40, Defs.' Exs. A & E.)

5    If, as in this case, prison officials declare a state of emergency, they place the

6  facility on lockdown and gradually reinstate regular programming.  During the reinstatement,

7  correctional staff interviews all inmates and searches all areas of the prison.  The process is time

8  and labor intensive.  On January 4, 2002, there were approximately 1,000 inmates assigned to B-

9  Facility.  Staff escorted one inmate at a time from his cell to the program office to interview him.

10  Staff followed up on any information they received during the investigation.  In addition, staff

11  shared information with other institutions and sent incident reports to the California Department

12  of Corrections and Rehabilitation ("CDCR") and to the Law Enforcement Investigative Unit

13  ("LEIU") for tracking purposes.  LEIU advises the CDCR director of any patterns of inmate

14  violence occurring statewide.  (Defs.' SUDF 42-45, Defs.' Exs. B & D.)

15    The January 4, 2002, assault on correctional officers involved Southern Hispanic

16  inmates, so correctional staff investigated the possibility that the Mexican Mafia prison gang at

17  Pelican Bay State Prison ordered the assault.  Staff at CSP-Sacramento communicated with staff

18  at Pelican Bay and other institutions to compare information and verify possible leads.  Staff at

19  Pelican Bay also interviewed inmates in an attempt to gather information.  Staff at CSP-

20  Sacramento searched every cell and common area at the prison.  Staff also dug up the yard to

21  ensure that there were no weapons hidden there.  (Defs.' SUDF 46-47, Defs.' Ex. B.)

22    After correctional staff completes inmate interviews and facility searches,

23  administrative officials determine whether inmates who they do not consider a threat to the safety

24  and security of the institution can return to regular programming.  Groups not involved in the

25  incident precipitating the declaration of a state of emergency are the first inmates allowed to

26  return to regular programming.  If an incident occurs during an unlock period, prison officials

1  decide whether to continue the return to regular programming.  Staff determines whether the

2  incident is related to the original incident precipitating the declaration of a state of emergency

3  and make changes to inmate programming accordingly.  (Defs.' SUDF 48-49, Defs.' Ex. B.)

4        Between January 2002 and September 2003, there were four separate assaults on

5  B-Facility staff.  After each incident, prison officials determined whether to put B-Facility back

6  on lockdown pending further investigation.  After staff completed each investigation,

7  administrative officials determined when inmates could safely return to programming.  (Defs.'

8  SUDF 50, Defs.' Ex. B.)

9  II.  Defendants' Arguments

10       Defense counsel argues that the defendants are entitled to summary judgment in

11 their favor on plaintiff's Eighth Amendment claims.  Specifically, counsel argues that a

12 prisoner's right to outdoor exercise is not absolute and that the Ninth Circuit has permitted long-

13 term denials of exercise where there has been a particularized security risk.  Here, counsel

14 contends that the evidence shows that prison officials declared a state of emergency and

15 implemented a lockdown after inmates stabbed several correctional officers.  According to

16 defense counsel, a total lockdown of the prison was necessary so that staff could investigate

17 whether inmates planned any further violence.  Staff also needed to interview inmates and search

18 the institution for additional weapons.  (Defs.' Mot. for Summ. J. at 8.)

19       Defense counsel contends that there was a threat of violence present for the

20 duration of the two-year lockdown at CSP-Sacramento and notes that the duration of the

21 lockdown was a result of repeated incidents of violence.  Counsel argues that the recurring

22 violence indicated to prison officials that they could not release prisoners in B-Facility because

23 the risk of inmate and staff injury was too high.  Instead of risking recurring violence, prison

24 officials conducted investigations, searched for weapons, transferred inmates fomenting violence,

25 and identified critical workers.  According to defense counsel, although these actions took

26 months to complete because of the large number of inmates at the prison, they were necessary to

1   establish a reasonably safe environment for the general population at CSP-Sacramento. (Defs.'

2   Mot. for Summ. J. at 8-9.)

3          Counsel argues that the evidence establishes that plaintiff did not have access to

4   the yard for three months.  He was then able to access the yard until prison officials implemented

5   another lockdown in response to separate incident of violence.  (Defs.' SUDF 28.)  Counsel notes

6   that plaintiff was not housed in B-Facility for the entire lockdown period but rather was moved

7   between units until eight months after the initial lockdown when he was transferred to another

8   state prison.  (Defs.' Mot. for Summ. J. at 8-9.)

9          Defense counsel also argues that the Constitution does not recognize the right to

10  canteen privileges.  Although inmates have a right to obtain personal hygiene supplies if they

11  cannot afford to purchase their own, plaintiff does not allege that he was deprived of all personal

12  hygiene supplies at the beginning of the lockdown.  Moreover, defendants contend, the evidence

13  establishes that prisoners in B-Facility could purchase hygiene items by March 1, 2002, less than

14  two months after the lockdown began.  In this regard, defense counsel argues that plaintiff was

15  not denied access to hygiene items for any significant period of time.  (Defs.' Mot. for Summ. J.

16  at 10.)

17         Defense counsel next argues that defendants are entitled to summary judgment on

18  plaintiff's denial of access to courts claims because plaintiff cannot show that he suffered an

19  actual injury as a result of defendants' alleged conduct.  Specifically, plaintiff alleges that he

20  would have been able to proceed to trial in two unidentified lawsuits if he had access to his

21  attorney and the law library.  However, defense counsel argues that plaintiff had access to his

22  attorney within days of the lockdown, had access to the paging system during the lockdown and

23  had access to the law library when programming returned to normal.  (Defs.' Mot. for Summ. J.

24  at 10.)  Moreover, defense counsel argues that to adequately plead a backward-looking denial of

25  access to courts claim, plaintiff must allege: (1) the loss of a nonfrivolous lawsuit; (2) the official

26  acts frustrating the litigation; and (3) the remedy that may be awarded as recompense but that is

1   not otherwise available in a future suit.  Here, according to defendants, plaintiff has not alleged

2   which of his many court cases were frustrated by his lack of access to the law library.  Moreover,

3   plaintiff's assertion that he would have won a more advantageous settlement in one of those

4   cases is speculative.  In addition, counsel contends that it was not foreseeable that defendants'

5   actions would deprive plaintiff access to the courts because he had access to the paging system

6   during the lockdown, and by April 19, 2002, all inmates except Southern Hispanic, Southern

7   Crip, and White inmates, had normal law library privileges.  According to defendants, plaintiff

8   could have gone to the library.  Finally, defendants contend that plaintiff's allegation that they

9   denied him access to his attorney is belied by the evidence.  They note that although prison

10  officials restricted all visiting at the beginning of the initial lockdown, they reinstated attorney

11  visits within weeks.  Defendants also point to evidence before this court establishing that plaintiff

12  in fact met with his attorney on January 27, 2002, three weeks after the lockdown began.  (Defs.'

13  Mot. for Summ. J. at 10-12.)

14         Finally, defense counsel argues that the defendants are entitled to qualified

15  immunity.  Specifically, counsel contends that plaintiff cannot show that the defendants violated

16  any clearly established constitutional rights.  Counsel argues that there is no clearly established

17  right to outdoor exercise or to other inmate programs when a lockdown is imposed as a result of

18  ongoing violence within a prison.  The right is even less clear where, as here, the efforts to

19  restore normal programming are disrupted by recurring incidents of violence.  Moreover, defense

20  counsel argues that a reasonable person in the defendants' position would have believed that the

21  decision to continue the lockdown until staff completed their investigations and the violence had

22  subsided was legal.  (Defs.' Mot. for Summ. J. at 12-14.)

23  III.  Plaintiff's Opposition

24         Plaintiff's lengthy opposition to defendants' motion for summary judgment is

25  supported by his own declaration, a statement of disputed facts, and a memorandum of points and

26  authorities.  Plaintiff's opposition is also supported by numerous exhibits attached thereto.

1    Plaintiff argues that defendants denied him outdoor exercise from January 4,

2    2002, to August 28, 2002, in violation of his rights under the Eighth Amendment.  According to

3    plaintiff, the defendants knew that Black and White inmates were not involved in the attack on

4    correctional officers in January 2002, but they wanted Black and White inmates to get angry in

5    order to provoke an inmate attack on Southern Hispanic inmates.  (Pl.'s Opp'n to Defs.' Mot. for

6    Summ. J. at 3-4.)

7    In addition, plaintiff argues that the defendants commenced an investigation to

8    identify who was responsible for the assault on correctional officers, but they knew which

9    inmates were involved the moment the attack took place.  Plaintiff further argues that defendants'

10   cell searches were complete within the first week of the lockdown and their interviews with

11   inmates were completed within two days of the incident.  (Pl.'s Opp'n to Defs.' Mot. for Summ.

12   J. at 5-6.)

13   Plaintiff next argues that he had no law library access during the lockdown.

14   Although defendants claim that there was a paging system available, plaintiff argues that the law

15   librarian instead spent her days making bag lunches for inmates.  Plaintiff also argues that the

16   defendants used food as a form of punishment and as a way to provoke the attack on Southern

17   Hispanic inmates. Plaintiff argues in this regard that defendants would not allow inmates to

18   purchase food items from the canteen and would not allow inmates to receive quarterly packages

19   unless they were critical workers.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 7-8, 13-17.)

20   Plaintiff notes that defense counsel suggests that plaintiff moved between housing

21   units at CSP-Sacramento during the lockdown, but points out that his moves were as follows:

22   once he was placed on contraband watch, once he was in administrative segregation because he

23   had an ongoing court case and needed access to the law library, and once he had an appearance in

24   the Sacramento County Superior Court but returned the same day.  In this regard, plaintiff

25   appears to argue that he did not receive relief from the lockdown.  (Pl.'s Opp'n to Defs.' Mot. for

26   Summ. J. at 9-11.)

1    Finally, plaintiff argues that defendants are not entitled to qualified immunity.  He

2    contends that the defendants knowingly and intentionally violated his constitutional rights.

3    Plaintiff reiterates that he had nothing to do with the attack on correctional staff or any of the

4    other incidents, but he nonetheless was required to suffer in his cell for more than eight months.

5    (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 24 & 29-32.)

6                                    **ANALYSIS**

7    I.  Plaintiff's Eighth Amendment Claims

8              A.  Denial of Outdoor Exercise

9        The instant case is virtually identical to two others filed in this court.  See

10   Norwood v. Alamedia, No. CIV S-03-2554 GEB GGH (E.D. Cal.); Williams v. Pliler, No. CIV

11   S-03-0615 ALA (E.D. Cal.).  In those cases, pro se plaintiffs alleged that the defendants violated

12   their rights under the Eighth Amendment by denying them outdoor exercise during the same

13   lockdowns imposed at CSP-Sacramento which are at issue here.  As in this case, the defendants

14   in those cases sought summary judgment in their favor on the Eighth Amendment claims.  After

15   reviewing the evidence submitted by the parties, the court determined in both cases that the

16   defendants were not entitled to judgment as a matter of law because they had not met their initial

17   burden of demonstrating the absence of a genuine issue of material fact.  See Williams v. Pliler,

18   No. CIV S-03-0615 ALA, 2007 WL 81914 at *19-*21 (E.D. Cal. Jan. 9, 2007); Norwood v.

19   Alamedia, No. CIV S-03-2554 GEB GGH, 2007 WL 685940 at *25-*27 (E.D. Cal. Mar. 5,

20   2007).

21       In this case, the court also finds that defendants are not entitled to judgment as a

22   matter of law.  The parties do not dispute that plaintiff was subject to three lockdown periods

23   during which time he did not have access to the yard.  Prison officials first placed CSP-

24   Sacramento on lockdown from January 2, 2002, to April 3, 2002, following an inmate assault on

25   Officer Lopez and three other officers.  Second, prison officials placed CSP-Sacramento on

26   lockdown from May 8, 2002, to August 8, 2002, after an inmate assault on Officer Tuter.

1  Finally, a few days later, prison officials placed CSP-Sacramento on lockdown from August 15,

2  2002, to August 27, 2002, following the discovery of missing metal stock from the B-Facility

3  dining rooms.  On August 28, 2002, plaintiff was transferred to Corcoran State Prison and was

4  no longer subject to the lockdowns imposed at CSP-Sacramento.

5          As in Williams and Norwood, the defendants in this case have not met their initial

6  burden of demonstrating the absence of a genuine issue of material fact.  Specifically, defendants

7  have not provided any evidence demonstrating that prison officials had to maintain the three

8  lockdown periods and restrict plaintiff's outdoor exercise for the length of time that they did.

9  Although defendants establish, and plaintiff does not dispute, that prison officials conducted

10  interviews with inmates and searched cells and common areas of the facility following the

11  precipitating lockdown incidents, defendants fail to establish that the interviews and searches

12  were ongoing through the duration of the lockdown periods.  Rather, defendants merely state in

13  general fashion that the interview and search process is time and labor intensive and took several

14  weeks for prison officials to complete.  (Defs.' SUDF 7.)  Nor do defendants otherwise establish

15  that the lockdown periods imposed at CSP-Sacramento were limited in duration as necessary to

16  maintain prison order and discipline or to protect staff and prisoners.  The court cannot find

17  based on the limited evidence submitted by the defendants that a state of emergency continued to

18  exist for the entire period of time so as to justify the extended lockdowns and denial of outdoor

19  exercise to prisoners as occurred here.  Accordingly, the court concludes that defendants are not

20  entitled to summary judgment in their favor on plaintiff's Eighth Amendment claim based on the

21  denial of outdoor exercise.

22          B.  Denial of Personal Hygiene Items

23          The court also finds that defendants are not entitled to summary judgment in their

24  favor as to plaintiff's Eighth Amendment claim based on the denial of access to personal hygiene

25  items at the canteen.  Although defendants acknowledge that inmates have a right to obtain

26  personal hygiene items, they maintain that plaintiff has failed to allege that he was deprived of all

19

1  personal hygiene items at the beginning of the lockdown.  Defendants contend that inmates were

2  allowed to purchase hygiene items at the canteen by March 1, 2002.

3          Defendants argument is unpersuasive for two reasons.  First, plaintiff expressly

4  alleges in his complaint that he "had long run out of those basic human need items which could

5  only be purchased through the canteen such as toothpaste, deodorant [sic], lotion, grease, and

6  soap." (Compl. at 9.)  Moreover, even if plaintiff was able to access the canteen by March 1,

7  2002, that would have been two months after the beginning of the initial lockdown.  Again, the

8  defendants have failed to present evidence establishing that the two-month-long restriction that

9  they imposed on canteen access was necessary to maintain prison order and discipline or to

10 protect staff and prisoners.  Accordingly, the court concludes that defendants are not entitled to

11 summary judgment in their favor on plaintiff's Eighth Amendment claim regarding the denial of

12 access personal hygiene items.

13 II.  <u>Plaintiff's First Amendment Access to Courts Claim</u>

14         The court finds that defendants are entitled to summary judgment on plaintiff's

15 denial of access to courts claims.  Defendants' evidence establishes that on January 18, 2002,

16 prison officials lifted restrictions on attorney visits for all inmates and that on January 27, 2002,

17 plaintiff was able to meet with his attorney.  In addition, defendants' evidence demonstrates that

18 plaintiff was provided with intermittent access to the law library during the lockdowns and that

19 during total lockdown periods all inmates could forward requests for legal reference materials to

20 the librarian through housing unit staff.  Given this evidence, the burden shifts to plaintiff to

21 establish the existence of a genuine issue of material fact precluding summary judgment in

22 defendants' favor.

23         The court has considered plaintiff's complaint as well as his opposition to the

24 pending motion for summary judgement, statement of disputed facts and declaration.  The

25 undersigned finds that plaintiff has failed to submit any evidence supporting his claim of denial

26 of access to the courts.  In his complaint plaintiff alleges that he was forced to settle two cases

1  because of the lockdowns, but he does not provide any evidence or information in support of the

2  allegation, such as the type of the cases in question or the posture of the cases at the time he

3  allegedly entered the settlements he claims to have been forced into.  See Christopher, 536 U.S.

4  at 415 ("the underlying cause of action, whether anticipated or lost, is an element that must be

5  described in the complaint . . . ."); Lewis, 518 U.S. at 351 ("Bounds did not create an abstract

6  freestanding right to a law library or legal assistance").

7           Moreover, even if plaintiff had alleged the loss of a "nonfrivolous" or "arguable"

8  case as a result of the lockdowns in his complaint, as he does in his opposition to the pending

9  summary judgment, he has not provided any evidence to establish that defendants' actions caused

10  his alleged deprivation or that he suffered any "actual injury."  Specifically, in his opposition to

11  defendants' motion, plaintiff merely argues that he was forced to settle Chappell v. Henry, No.

12  CIV S-99-1454 FCD JFM P and Chappell v. Gaitonde, No. CIV S-99-0235 LKK JFM P for

13  "little or nothing" when he could have prevailed at trial but for the lockdowns.  In Chappell v.

14  Henry, No. CIV S-99-1454 FCD JFM P, plaintiff was represented by counsel.  To the extent that

15  plaintiff claims that he did not have access to his attorney or access to the law library and that the

16  lockdown conditions forced him to settle that case, his claim is unsupported by any evidence.  It

17  is true that plaintiff has submitted a letter written by his attorney Michael Rooney to defense

18  counsel in Case No. CIV S-99-1454 FCD JFM P, in which attorney Rooney states that defense

19  counsel improperly contacted plaintiff, provided him with analyses regarding the case and

20  pressured plaintiff into a settlement agreement after the discussion.  (Pl.'s Opp'n Ex. H.)

21  However, even assuming that the events described in attorney Rooney 's letter took place, the

22  settlement was reached and the court entered judgment in Case No. CIV S-99-1454 FCD JFM P

23  well before defendants imposed the initial lockdown at CSP-Sacramento on January 4, 2002.

24  See Chappell v. Henry, No. CIV S-99-1454 FCD JFM P (Judgment Entered Oct. 19, 2001).

25           Similarly, to the extent plaintiff claims that the lockdowns forced him to settle his

26  claims in Chappell v. Gaitonde, No. CIV S-99-0235 LKK JFM P, court records as well as the

1  evidence presented in this case demonstrate otherwise.  As early as April 6, 2001, well before the

2  initial lockdown was imposed at CSP-Sacramento, plaintiff (not the defendants) moved the court

3  for a court-ordered settlement.  On April 30, 2002, in the midst of the lockdown, plaintiff moved

4  the court to schedule a trial confirmation hearing and informed the court that he had already

5  attempted to settle the case on three occasions.  Finally, on September 17, 2002, nearly a month

6  after plaintiff had been transferred to Corcoran State Prison and was no longer subject to the

7  lockdown conditions at CSP-Sacramento, plaintiff signed a settlement agreement and voluntarily

8  dismissed the action in question by stipulation.  Even if plaintiff's intermittent access to the law

9  library and to the paging system at CSP-Sacramento were inadequate, "prison law libraries and

10 legal assistance programs are not ends in themselves, but only the means for ensuring a

11 reasonably adequate opportunity to present claimed violations of fundamental constitutional

12 rights to the courts.'"  Lewis, 518 U.S. at 351.  A review of Case No. CIV S-99-0235 LKK JFM

13 P demonstrates that plaintiff had more than a sufficient opportunity to present his claims in court.

14 In fact, his case was proceeding to trial on February 3, 2003, long after he transferred to Corcoran

15 State Prison, but plaintiff chose to voluntarily settle the matter.  This was not a case, for example,

16 where plaintiff was unable to file a complaint or unable to comply with a court order because of

17 limited access to the library.  Lewis, 518 U.S. at 351.  Accordingly, the court concludes that

18 defendants are entitled to summary judgment in their favor on plaintiff's First Amendment denial

19 of access to courts claims.

20 III.  Qualified Immunity

21         For the reasons set forth immediately above, the court has already determined that

22 defendants are entitled to summary judgment with respect to plaintiff's denial of access to courts

23 claim.  Accordingly, the undersigned will only address defendants' qualified immunity

24 arguments as they pertain to plaintiff's Eighth Amendment claims.

25         As noted above, the facts alleged in this case taken in the light most favorable to

26 plaintiff are sufficient, if proven, to demonstrate that defendants violated plaintiff's rights under

1    the Eighth Amendment.  In addition, the state of the law in 2002 clearly would have given

2    defendants fair warning that their refusal to provide plaintiff with adequate outdoor exercise was

3    unconstitutional.  See, e.g., Allen v. Sakai, 40 F.3d 1001, 1004 (9th Cir. 1994) (defendants were

4    not entitled to qualified immunity because "[a]fter Spain and Toussaint, it should have been

5    apparent to defendants that they were required to provide regular outdoor exercise to [plaintiff] . .

6    . .."); LeMaire, 12 F.3d at 1457 ("Exercise has been determined to be one of the basic human

7    necessities protected by the Eighth Amendment."); Toussaint v. Yockey, 722 F.2d 1490, 1493

8    (9th Cir. 1984) (denial of adequate outdoor exercise to inmates in administrative segregation

9    raises a "substantial constitutional question"); Spain v. Procunier, 600 F.2d 189, 200 (9th Cir.

10   1979) ("it was cruel and unusual punishment for a prisoner to be confined for a period of years

11   without opportunity to go outside except for occasional court appearances, attorney interviews,

12   and hospital appointments.").

13          Likewise, the state of the law in 2002 clearly would have given defendants fair

14   warning that their refusal to provide plaintiff with access to the canteen so that he could obtain

15   personal hygiene items was unconstitutional.  See, e.g., Toussaint, 801 F.2d at 1107 ("The

16   discrete basic human needs that prison officials must satisfy include food, clothing, shelter,

17   sanitation, medical care, and personal safety."); Keenan, 83 F.3d at 1091 (inmates have an Eighth

18   Amendment right to personal hygiene items including tooth brushes and soap); Hoptowit v. Ray,

19   682 F.2d 1237, 1246 (9th Cir. 1982) (prison officials are constitutionally obligated to furnish

20   inmates with sanitary conditions under the Eighth Amendment).

21          Accordingly, defendants are not entitled to summary judgment in their favor with

22   respect to their affirmative defense of qualified immunity with respect to plaintiff's claim that his

23   rights under the Eighth Amendment were violated.

24                                    **OTHER MATTERS**

25          In addition to the claims addressed above, plaintiff expressly alleges in his

26   complaint that defendants violated his rights under the Fourteenth Amendment's Equal

1   Protection and Due Process Clauses as well as under California Penal Code § 825 and California

2   Code of Regulations Title 15, § 3175.  (Compl. at 12-15.)  Plaintiff also appears to allege that

3   defendants violated his rights under the Eighth Amendment by banning tobacco and by providing

4   him with inadequate food.  (Id. at 13-14.)  Plaintiff elaborates on these aspects of his Eighth

5   Amendment claim in his opposition to defendants' motion for summary judgment.  However,

6   defense counsel chose not to address these claims in the defendants' pending motion for

7   summary judgment.[1]  Moreover, defense counsel inexplicably elected not to file a reply in which

8   these additional claims should have been addressed.  Under the court's scheduling order, the time

9   for filing additional pretrial motions has passed.  See Orders filed July 9, 2008 (Doc. No. 44) and

10  December 31, 2008 (Doc. No. 46).  Nonetheless, under 28 U.S.C. 1915(e)(2)(B)(ii) "the court

11  shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to

12  state a claim upon which relief may be granted."  See Byrd v. Maricopa County Sheriff's

13  Department, ___ F.3d___, 2009 WL 1362941, *2-4 (9th Cir. May 18, 2009) (affirming the

14  district court's sua sponte dismissal of a prisoner's equal protection cause of action for failure to

15  state a cognizable claim even though defendants failed to move for summary judgment on that

16  claim).  In order to properly manage its docket and to ensure an orderly trial in this action,

17  pursuant to 28 U.S.C. 1915(e)(2)(B)(ii), the court will address plaintiff's outstanding claims

18  below.

19          The court finds that plaintiff's complaint does not state a cognizable claim under

20  the Fourteenth Amendment Equal Protection Clause.  Equal protection is relevant with respect to

21  classifications that impermissibly operate to disadvantage a suspect class or improperly interfere

22  with an individual's exercise of a fundamental right.  "[A] classification neither involving

23  fundamental rights nor proceeding along suspect lines is accorded a strong presumption of

24  validity."  Heller v. Doe, 509 U.S. 312, 319 (1993).  The Ninth Circuit has held that "§ 1983

25

26          [1] By order filed January 5, 2006, the court found that plaintiff's pro se complaint stated
        cognizable claims for relief.

claims based on Equal Protection violations must plead intentional unlawful discrimination or

allege facts that are at least susceptible of an inference of discriminatory intent."  Byrd, 2009

WL 1362941 at *4 (quoting Monteiro v. Tempe Union High School District, 158 F.3d 1022,

1026 (9th Cir. 1998)).  In this case, plaintiff merely alleges that prison officials kept him on

lockdown status for months while allowing other inmates classified as "critical workers" to

access to the yard and the canteen.  Plaintiff has not alleged facts demonstrating that he is a

member of a suspect class in this regard.  Rather, he simply alleges in conclusory fashion that

this difference in treatment "was clearly an equal protection violation."  (Compl. at 14-15; Pl.'s

SDF at 3-4.)  The Equal Protection Clause "is essentially a direction that all persons similarly

situated should be treated alike."  City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S.

432, 439 (1985).  Plaintiff, who admits that he does not have a job, is not "similarly situated" to

inmates classified as critical workers.  Nor has plaintiff alleged that there was no rational basis

for the difference in treatment between non-critical workers and critical workers.  Accordingly,

plaintiff has failed to allege a cognizable equal protection claim.

In addition, plaintiff's complaint does not state a cognizable claim under the

Fourteenth Amendment Due Process Clause.  Specifically, plaintiff has no procedural due

process right to a hearing to determine whether defendants' decision to impose an emergency

prison-wide lockdown was justified.  See Hayward, 629 F.2d at 601-03; cf. Johnson v. Moore,

948 F.2d 517, 519 (9th Cir. 1991) ("Because confinement to a prison cell does not violate in and

of itself any recognized liberty interest of federal prisoners, no hearing was necessary before

imposing 'cell lockdown'").  Insofar as plaintiff seeks to raise a substantive due process claim,

"[w]here a particular amendment 'provides an explicit textual source of constitutional protection'

against a particular sort of government behavior, 'that Amendment, not the more generalized

notion of "substantive due process" must be the guide for analyzing plaintiff's claims.'"  Albright

v. Oliver, 510 U.S. 266, 273 (1994).  Here, the Eighth Amendment provides the "explicit textual

/////

source of constitutional protection" for plaintiff's claims stemming from the challenged lockdowns.

Nor does plaintiff's complaint state a cognizable claim under California Penal Code § 825. That state statute governs an arrestee's appearance before a magistrate judge and states that, after an arrest, an attorney may visit the prisoner upon his request. Cal. Penal Code § 825(b). The provision allows a prisoner to recover up to $500.00 from an officer who refuses to allow such a visit. However, the civil remedy under § 825 by its terms extends only to arrestees, and not to convicted state prisoners.

Plaintiff's complaint also does not state a cognizable claim under the California Code of Regulations Title 15, § 3175. That regulation governs the standards of conduct for inmates and their visitors. See Cal. Code of Regs. tit. 15, § 3175 (a)-(c). However, there is no reported state or federal decision finding that an independent cause of action is authorized by these regulations. Section 1983 provides a cause of action only for violations of the United States Constitution and federal laws. See Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) ("To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress.")

Finally, plaintiff's complaint also does not state a cognizable claim under the Eighth Amendment for the banning of tobacco from prisons. Even if plaintiff used tobacco, the vague and conclusory allegations of his complaint fail to allege any action by defendants causing sufficient harm to establish a constitutional violation in light of contemporary standards of decency. See Hudson, 503 U.S. at 8; see also, e.g., Lafaele v. Schwarzenegger, No. CIV S-06-1049 FCD DAD, 2008 WL 4532512 at *4 (E.D. Cal. Oct. 8, 2008) (plaintiff's complaint regarding the tobacco ban in state prisons failed to state a cognizable claim under the Eighth Amendment); Larson v. Runnels, No. CIV S-06-1413 ALA, 2008 WL 220377 at *3 (E.D. Cal. Jan 25, 2008) ("there are no court decisions holding that the denial of tobacco products,

26

including snuff, deprives prisoners of their right to be free from cruel and unusual punishment");

Larson v. Runnels, No. CIV S-06-1934 FCD GGH, 2007 WL 2712110 at * 2 (E.D. Cal. Sept. 14,

2007) ("The actions of prison officials in banning tobacco cannot possibly be an Eighth

Amendment or Fourteenth Amendment violation."); Owens v. Ayers, No. C 01-3720 SI (PR),

2002 WL 73226 at *3 (N.D. Cal. Jan. 15, 2002) ("It belittles the Eighth Amendment to suggest

that a three-month ban on the possession of personal property, such as tobacco and lighters

(which could not be used within the housing unit in any event), amounts to cruel and unusual

punishment.")

Plaintiff's complaint does, however, state a cognizable claim for relief against

defendants under the Eighth Amendment for the denial of adequate food.  It is well established

that "food is one of life's basic necessities"  Foster v. Runnels, 554 F.3d 807, 813 (9th Cir.

2009).  Under the Eighth Amendment, food does not need to be tasty or aesthetically pleasing,

but it does need to be adequate to maintain health.  LeMaire, 12 F.3d at 1456.  In his complaint,

plaintiff clearly alleges that during the challenged lockdowns defendants provided him with only

two bag lunches a day and denied him access to the canteen, which carries a variety of food items

that were, according to plaintiff, "very much needed!"  (Compl. at 8-9.)  In addition, plaintiff

expressly claims that the defendants' actions in denying him access to the commissary/canteen

services constituted cruel and unusual punishment.  (Id. at 13-14.)  Liberally construing

plaintiff's pro se complaint, the court finds that plaintiff must be allowed to proceed on this

claim.[2]

For the reasons set forth above, the court will recommend that plaintiff's equal

protection and due process claims under the Fourteenth Amendment, his state law claims under

California Penal Code § 825 and California Code of Regulations Title 15, § 3175 (a)-(c), and his

---

[2]  In his opposition to defendants' motion for summary judgment plaintiff elaborates upon this claim, arguing that he lost nearly 30 pounds and experienced stomach pains and dizziness during the lockdown periods at issue here because defendants failed to provide him with adequate food.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 17-18, 25-26 & 30.)

Eighth Amendment claim based upon the banning of tobacco from CSP-Sacramento be

dismissed for failure to state a cognizable claim.  The court will also recommend that plaintiff be

allowed to proceed on his claim that his Eighth Amendment rights were violated when

defendants allegedly denied him adequate food.[3]

## CONCLUSION

IT IS HEREBY RECOMMENDED that defendants' January 26, 2009 motion for

summary judgment (Doc. No. 47) be granted in part and denied in part as follows:

1.  Defendants' motion for summary judgment on plaintiff's Eighth Amendment

claims be denied;

2.  Defendants' motion for summary judgment on plaintiff's First Amendment

denial of access to courts claims be granted;

3.  Defendants' motion for summary judgment with respect to the affirmative

defense of qualified immunity be denied;

4.  Plaintiff's Fourteenth Amendment equal protection and due process claims, his

state law claims brought under California Penal Code § 825 and California Code of Regulations

Title 15, § 3175 (a)-(c), and plaintiff's Eighth Amendment claim challenging the banning of

tobacco from CSP-Sacramento be dismissed for failure to state a cognizable claim; and

/////

---

[3]  To the extent that plaintiff argues for the first time in his opposition to defendants' motion for summary judgment that defendants retaliated against him in violation of the First Amendment, he is advised that an opposition to a motion for summary judgment is not a proper vehicle for adding new claims to his complaint.  If plaintiff wished to proceed on a retaliation claim, he needed to file a motion for leave to amend, together with a proposed amended complaint on or before December 26, 2008, the deadline for filing all pretrial motions in this case.  (Order filed July 9, 2008.)  Liberally construed, plaintiff's original complaint fails to state any retaliation claims.  See Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) ("within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.").

1        5.  The case proceed solely on plaintiff's Eighth Amendment claims regarding

2    denial of outdoor exercise, personal hygiene items and adequate food.

3            These findings and recommendations will be submitted to the United States

4    District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

5    twenty days after being served with these findings and recommendations, any party may file and

6    serve written objections with the court.  A document containing objections should be titled

7    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to objections

8    shall be filed and served within ten days after service of the objections.  The parties are advised

9    that failure to file objections within the specified time may, under certain circumstances, waive

10   the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

11   1991).

12   DATED: June 10, 2009.

13

14   _____

15   DALE A. DROZD
     UNITED STATES MAGISTRATE JUDGE

16   DAD:9
     chap1183.57

17

18

19

20

21

22

23

24

25

26