1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   REX CHAPPELL,                          No.  2:04-cv-1183 TLN DB P

12               Plaintiff,

13        v.                                ORDER AND FINDINGS AND
                                            RECOMMENDATIONS
14   C.K. PLILER, et al.,

15               Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18   action under 42 U.S.C. § 1983.  Plaintiff alleges that measures imposed during prison lockdowns

19   in 2002 violated his Eighth and First Amendment rights.  Before the court is defendants' motion

20   for summary judgment.  For the reasons set out below, the undersigned recommends defendants'

21   motion be granted in part and denied in part.

22                              **PROCEDURAL HISTORY**

23        Plaintiff's claims arose at California State Prison-Sacramento ("CSP-Sacramento") in

24   2002.  Plaintiff's complaint was filed on June 21, 2004.  (ECF No. 1.)  On January 5, 2006, the

25   court granted plaintiff's application to proceed in forma pauperis and determined that plaintiff's

26   complaint states cognizable claims for relief against the five defendants.  On February 2, 2006,

27   the United States Marshal was directed to serve plaintiff's complaint on defendants Pliler,

28   ////

                                             1

1   Rosario, Stiles, Goughnour, and Vance.  (ECF No. 10.)  In that order, the court also informed

2   plaintiff of the requirements for opposing a motion for summary judgment.  (Id. at 4-5.)

3       On April 3, 2006, defendants filed a motion to dismiss the complaint on the grounds that

4   plaintiff's in forma pauperis status should be revoked.  (ECF No. 12.)  In 2007, defendants'

5   motion was denied.  (ECF Nos. 18, 23.)  On January 26, 2009, defendants moved for summary

6   judgment.  (ECF No. 47.)

7       On June 11, 2009, previously-assigned Magistrate Judge, now District Judge, Drozd found

8   defendants had not met their burden of showing no genuine issue of material fact with respect to

9   plaintiff's Eighth Amendment claims.  Judge Drozd found defendants had not established that the

10  lockdown periods justified the restriction on plaintiff's outdoor exercise and access to personal

11  hygiene items at the canteen.  (ECF No. 55 at 18-20.)  Judge Drozd further found defendants were

12  not entitled to qualified immunity on the Eighth Amendment claims.  (Id. at 22-23.)  Judge Drozd

13  relied in large part on two cases then pending in this district regarding the denial of outdoor

14  exercise at CSP-Sacramento during the 2002 lockdown, Norwood v. Vance, No. 2:03-cv-2554-

15  GEB-GGH (E.D. Cal.) and Williams v. Pliler, No. 2:03-cv-0615 ALA (E.D. Cal.).  In both cases,

16  judges held that the defendants were not entitled to judgment as a matter of law because they had

17  not met their initial burden of demonstrating the absence of a genuine issue of material fact.  (Id.

18  at 18.)  With respect to plaintiff's First Amendment claims, Judge Drozd found plaintiff failed to

19  submit any evidence supporting his claims that he was denied access to the courts.  (Id. at 20-22.)

20  Judge Drozd recommended the district judge grant summary judgment in defendants' favor on the

21  First Amendment claims.

22      Judge Drozd noted that defendants' motion failed to address some of plaintiff's claims.

23  He found that plaintiff stated a cognizable claim under the Eighth Amendment for the denial of

24  adequate food and that plaintiff failed to state cognizable claims for violations of his Fourteenth

25  Amendment equal protection and due process rights, for violations of state law, and for a

26  violation of the Eighth Amendment based on the prison's tobacco ban.  (Id. at 23-28.)  Finally,

27  Judge Drozd noted that plaintiff appeared to be arguing a First Amendment retaliation claim in

28  his opposition to the summary judgment motion.  Judge Drozd informed plaintiff that he could

1    not add new claims in his opposition and the time to amend his petition had passed.  (Id. at 28

2    n.3.)

3              Before ruling on defendants' objections to Judge Drozd's findings and recommendations,

4    on September 4, 2009, District Judge Karlton noted that the Ninth Circuit Court of Appeals had

5    reversed the district court's decision in Norwood, upon which the magistrate judge's findings and

6    recommendations in the present case had relied heavily.  (ECF No. 57.)  Judge Karlton noted that

7    the Norwood petitioner sought rehearing en banc, which had not, at that time, been ruled on.

8    Judge Karlton stayed these proceedings pending a decision in Norwood "[b]ecause the Court of

9    Appeals' resolution of Norwood is highly relevant to the resolution of the instant case,

10   particularly on the issue of qualified immunity of the defendants in factual circumstances virtually

11   identical between the two cases."  (Id. at 2.)

12             After the Ninth Circuit denied the request for rehearing en banc, the stay in the present

13   case was lifted in 2012.  (ECF Nos. 63, 74.)

14             On August 21, 2015, Judge Drozd ordered the parties to file supplemental briefs

15   addressing the application of the Ninth Circuit's decision in Norwood to the present case and

16   addressing defendants' 2009 motion for summary judgment.  (ECF No. 85.)  In response,

17   defendants filed the present motion for summary judgment.  (ECF No. 88.)  Plaintiff filed a

18   response in which he complained about the slow pace of these proceedings, the number of briefs

19   he has been required to file, and the denials of his many requests for the appointment of counsel.

20   (ECF No. 90.)   With respect to the applicability of Norwood, plaintiff stated simply that it does

21   not apply.  (Id. at 4.)  On May 12, 2016, plaintiff filed a "Declaration in Opposition to the

22   Defendants' Summary Judgment" and an "Opposition to Defendants Statement of Undisputed

23   Facts."  (ECF Nos. 98, 99.)   On May 20, defendants filed a reply brief.  (ECF No. 100.)

24             While defendants do not explain their intentions with respect to the 2009 summary

25   judgment motion, the court assumes their intention is replacement of the prior motion for

26   summary judgment with the motion filed on October 5, 2015.  Accordingly, and for the purpose

27   of clarifying the docket in this case, this court will vacate the findings and recommendations

28   ////

3

1    issued on June 11, 2009.  Below, this court addresses defendants' pending motion filed October 5,
2    2015.

**PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT**

4           Plaintiff is proceeding on his original complaint.  Therein, he alleges as follows.
5    On January 4, 2002, prison officials at CSP-Sacramento placed the facility on lockdown
6    following a violent incident in the dining hall between Southern Mexican inmates and
7    correctional staff.  During the extended lockdown that resulted, plaintiff was not allowed outdoor
8    exercise time, canteen privileges, quarterly packages, or visitation.  In addition, prison officials
9    issued a memorandum stating that all tobacco products would be considered contraband in 30
10   days.  On two separate occasions during the lockdown, plaintiff's attorney attempted to visit him
11   but prison officials denied plaintiff the right to see him.  Prison officials also denied plaintiff
12   access to the law library.  According to plaintiff, as a result of this lockdown he had virtually no
13   permissible out-of-cell activity from January 2002 to August 2002.  (Compl. at 1-7 (ECF No. 1).)

14          Plaintiff claims that the defendants denied him outdoor exercise, access to the
15   canteen and hygiene products, and adequate food for more than eight months in violation of the
16   Eighth Amendment.  He claims that the defendants interfered with his right of access to the courts
17   by denying him visits with his attorney and access to the law library in violation of the First
18   Amendment.  Plaintiff also claims that defendants denied him equal protection and due process
19   by imposing lockdown conditions on him while allowing privileges to those designated "critical
20   workers" in violation of the Fourteenth Amendment.  Finally, plaintiff claims that defendants
21   violated California Penal Code § 825(b) and California Code of Regulations Title 15, § 3175.
22   Plaintiff requests monetary damages.  (Id. at 12-17.)

**SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

24          Summary judgment is appropriate when the moving party "shows that there is no genuine
25   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
26   Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of
27   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litigation, 627
28   F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

4

1   moving party may accomplish this by "citing to particular parts of materials in the record,

2   including depositions, documents, electronically stored information, affidavits or declarations,

3   stipulations (including those made for purposes of the motion only), admissions, interrogatory

4   answers, or other materials" or by showing that such materials "do not establish the absence or

5   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

6   support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

7          When the non-moving party bears the burden of proof at trial, "the moving party need

8   only prove that there is an absence of evidence to support the nonmoving party's case." Oracle

9   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).  See also Fed. R. Civ. P. 56(c)(1)(B).

10  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

11  against a party who fails to make a showing sufficient to establish the existence of an element

12  essential to that party's case, and on which that party will bear the burden of proof at trial.  See

13  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

14  nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a

15  circumstance, summary judgment should be granted, "so long as whatever is before the district

16  court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

17         If the moving party meets its initial responsibility, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

19  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

20  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

22  admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

23  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

24  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

26  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

27  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

28  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## OTHER APPLICABLE LEGAL STANDARDS

### I.      Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform

////

6

1  an act which he is legally required to do that causes the deprivation of which complaint is made."

2  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

3      Supervisory personnel are generally not liable under § 1983 for the actions of their employees

4  under a theory of respondeat superior and, therefore, when a named defendant holds a

5  supervisorial position, the causal link between him and the claimed constitutional violation must

6  be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v.

7  Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the

8  involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of

9  Regents, 673 F.2d 266, 268 (9th Cir. 1982).

10     **II.      Legal Standards Applicable to Eighth Amendment Claims**

11     The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

12  Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

13  unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

14  312, 319 (1986).  To prevail on an Eighth Amendment claim, the plaintiff must show, objectively,

15  that he suffered a "sufficiently serious" deprivation.  Farmer v. Brennan, 511 U.S. 825, 834

16  (1994); Wilson v. Seiter, 501 U.S. 294, 298–99 (1991).  The plaintiff must also show that each

17  defendant had, subjectively, a culpable state of mind in causing or allowing plaintiff's deprivation

18  to occur.  Farmer, 511 U.S. at 834.

19     The Ninth Circuit has clarified the elements necessary to state a deprivation that rises to the

20  level of an Eighth Amendment violation:

21          An Eighth Amendment claim that a prison official has deprived
            inmates of humane conditions must meet two requirements, one
22          objective and one subjective. Allen v. Sakai, 48 F.3d 1082, 1087
            (9th Cir. 1995). "Under the objective requirement, the prison
23          official's acts or omissions must deprive an inmate of the minimal
            civilized measure of life's necessities. The subjective requirement,
24          relating to the defendant's state of mind, requires deliberate
            indifference." Id. (citations omitted).
25

26  Lopez v. Smith, 203 F.3d 1122, 1132–33 (9th Cir. 2000).  Determining "deliberate indifference"

27  is a two-part inquiry.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citing Farmer, 511

28  U.S. at 834).  First, the inmate must show that the prison officials were aware of a "substantial

1  risk of serious harm" to an inmate's health or safety.  Id.  Second, the inmate must show that the

2  prison officials had no "reasonable" justification for the deprivations, in spite of that risk.

3  Farmer, 511 U.S. at 844 ("Prison officials who actually knew of a substantial risk to inmate health

4  or safety may be found free from liability if they responded reasonably."); Thomas, 611 F.3d at

5  1150.

6            **A.   Standards for Claim of Denial of Outdoor Exercise**

7        Outdoor exercise is a basic human need protected by the Eighth Amendment, and the denial

8  of outdoor exercise may violate the Constitution, depending on the circumstances.  Richardson v.

9  Runnels, 594 F.3d 666 (9th Cir. 2010); Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010).

10  When an inmate alleges the denial of constitutionally adequate outdoor exercise, the inquiry is

11  fact specific. In determining whether a deprivation of outdoor exercise is sufficiently serious, the

12  court must consider the circumstances, nature, and duration of the deprivation.  Spain v.

13  Procunier, 600 F.2d 189, 199 (9th Cir. 1979).

14       "[T]he Ninth Circuit has not identified a specific minimum amount of weekly exercise that

15  must be afforded" under the Eighth Amendment.  Jayne v. Bosenko, No. 2:08-cv-2767 MSB,

16  2009 WL 4281995, at *8 (E.D. Cal. Nov. 23, 2009) (citation omitted).  Indeed, complete denial of

17  outdoor exercise for a month may not be  unconstitutional.  Hayward v. Procunier, 629 F.2d 599,

18  603 (9th Cir. 1980) (denial of yard time for a month not unconstitutional); May v. Baldwin, 109

19  F.3d 557, 565–66 (9th Cir. 1997) (denial of yard time for 21 days not unconstitutional).

20  However, in Lopez, the Ninth Circuit found that plaintiff's claim that he was denied all outdoor

21  exercise for six and a half weeks met the objective requirement for an Eighth Amendment claim.

22  203 F.3d at 1132–33.

23        The Ninth Circuit has distinguished between "temporary" denials of outdoor exercise and

24  "long-term" denials.  For a temporary denial of exercise to be actionable, plaintiff must

25  demonstrate an adverse medical impact.  Lopez, 203 F.3d at 1133 n.15.  A long-term deprivation

26  is considered substantial regardless of its effects.  Id.; see also Norwood, 591 F.3d at 1070.  The

27  21-day denial of yard time in May met the definition of a "temporary" deprivation, while the six-

28  ////

1  week denial of yard time considered in <u>Lopez</u> was a "long-term" deprivation.  <u>See Lopez</u>, 203

2  F.3d at 1133 n.15.

3  **B.  Standards for Claim of Denial of Hygiene Products**

4  Prison officials have a duty to ensure that prisoners are provided adequate shelter, food,

5  clothing, sanitation, medical care, and personal safety.  <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th

6  Cir. 2000); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1107 (9th Cir. 1986).  This duty includes

7  providing access to personal hygiene items under the Eighth Amendment.  <u>See Keenan v. Hall</u>, 83

8  F.3d 1083, 1091 (9th Cir. 1996), <u>amended</u>, 135 F.3d 1318 (1998) (mem.).  However, the routine

9  discomfort inherent in the prison setting is inadequate to satisfy the objective prong of an Eighth

10  Amendment inquiry.  Only those deprivations denying "the minimal civilized measure of life's

11  necessities" are sufficiently grave to form the basis of an Eighth Amendment violation."  <u>Rhodes</u>

12  <u>v. Chapman</u>, 452 U.S. 337, 347 (1981).

13  **C.  Standards for Claim of Denial of Adequate Food**

14  It is well established that "food is one of life's basic necessities."  <u>Foster v. Runnels</u>, 554 F.3d

15  807, 813 (9th Cir. 2009).  "The sustained deprivation of food can be cruel and unusual

16  punishment when it results in pain without any penological purpose."  <u>Id.</u> at 814 (citing <u>Phelps v.</u>

17  <u>Kapnolas</u>, 308 F.3d 180, 187 (2nd Cir. 2002)).  Under the Eighth Amendment, food does not need

18  to be tasty or aesthetically pleasing, but it does need to be adequate to maintain health.  <u>LeMaire</u>

19  <u>v. Maass</u>, 12 F.3d 1444, 1456 (9th Cir. 1993); <u>see also</u> <u>Thompson v. Gibson</u>, 289 F.3d 1218, 1222

20  (10th Cir. 2002) (food provided must be "nutritionally adequate") (citing <u>Ramos v. Lamm</u>, 639

21  F.2d 559, 570-71 (10th Cir. 1980)); <u>Robles v. Coughlin</u>, 725 F.2d 12, 15 (2nd Cir. 1983) (per

22  curiam) (the Eighth Amendment requires prisoners to be provided with "nutritionally adequate

23  food that is prepared and served under conditions which do not present an immediate danger to

24  the health and well being of the inmates who consume it"); <u>cf.</u> <u>Hutto v. Finney</u>, 437 U.S. 678,

25  683, 686-87 (1978) (remarking that conditions of confinement that included a 1000–calorie–per–

26  day diet of "'grue,' a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs,

27  and seasoning into a paste and baking the mixture in a pan,". . . "might be tolerable for a few days

28  and intolerably cruel for weeks or months").

To establish an Eighth Amendment claim for the deprivation of food, a plaintiff must allege facts showing that objectively he suffered a sufficiently serious deprivation and that subjectively each defendant had a culpable state of mind in allowing or causing the plaintiff's deprivation to occur. Wilson, 501 U.S. at 298–99. Further, a showing of mental or emotional injury alone is not actionable under § 1983. A plaintiff bringing a suit under § 1983 must show he has suffered physical injury, in addition to mental and emotional harms. 42 U.S.C. § 1997e(e); see also Perkins v. Kansas Dept. of Corr., 165 F.3d 803, 807 (10th Cir. 1999).

### III.     Legal Standards for First Amendment Claims of Access to the Courts

Prison inmates have a constitutionally protected right to access the courts in order to bring challenges to their criminal convictions and to the conditions of their confinement. Lewis v. Casey, 518 U.S. 343, 354–55 (1996). "[A]side from their affirmative right to the tools necessary to challenge their sentences or conditions of confinement, prisoners also have a right, protected by the First Amendment right to petition and the Fourteenth Amendment right to substantive due process, 'to pursue legal redress for claims that have a reasonable basis in law or fact.'" Silva v. Di Vittorio, 658 F.3d 1090, 1103 (9th Cir. 2011) (quoting Snyder v. Nolen, 380 F.3d 279, 291 (7th Cir. 2004)), overruled on other grounds as stated in Richey v. Dahne, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). When a prisoner alleges such interference, he must demonstrate actual injury such as the inability to meet a filing deadline or to present a non-frivolous claim. Lewis, 518 U.S. at 348–49, 352–53 & n. 3; Silva, 658 F.3d at 1102–03; Nevada Dept. of Corr. v. Greene, 648 F.3d 1014, 1018 (9th Cir. 2011). Actual injury is a jurisdictional requirement and may not be waived. Nevada Dept. of Corr., 648 F.3d at 1018 (citing Lewis, 518 U.S. at 349).

An "actual injury" is some specific "instance in which an inmate was actually denied access to the courts." Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir. 1989), overruled on other grounds, Lewis, 518 U.S. at 349. To prove an actual injury, the prisoner must show that the inadequacy in the institution's program hindered his effort to pursue a non-frivolous claim concerning his conviction or conditions of confinement. See Lewis, 518 U.S. at 354–55. For example, an impermissible hindrance might be shown by the dismissal of a prisoner's action for failure to
////

1  satisfy some technical requirement because of deficiencies in the prison's legal assistance

2  program.  Id. at 351.

3    **IV.    Legal Standards for Qualified Immunity**

4    Government officials enjoy qualified immunity from civil damages unless their conduct

5  violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

6  (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a court is

7  presented with a qualified immunity defense, the central questions for the court are: (1) whether

8  the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

9  defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

10  was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v.

11  Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in

12  sequence).  "Qualified immunity gives government officials breathing room to make reasonable

13  but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743

14  (2011).  The existence of triable issues of fact as to whether prison officials were deliberately

15  indifferent does not necessarily preclude qualified immunity.  Estate of Ford v. Ramirez–Palmer,

16  301 F.3d 1043, 1053 (9th Cir. 2002).

17    In Noble v. Adams, 646 F.3d 1138 (9th Cir. 2011), the Ninth Circuit determined that prison

18  officials were entitled to qualified immunity with respect to a seven-month lockdown following a

19  prison riot, as

20    . . . it was not clearly established in 2002—nor is it established
    yet—precisely how, according to the Constitution, or when a prison
21    facility housing problem inmates must return to normal operations,
    including outside exercise, during and after a state of emergency
22    called in response to a major riot, here one in which inmates
    attempted to murder staff.
23

24  Id. at 1143; see also Mitchell v. Cate, No. 2:08-cv-1196, 2014 WL 546338, *17  (E.D. Cal.

25  Feb.11, 2014).  District courts have since held that "[i]t is not clearly established exactly how or

26  when prison officials must lift a lockdown or modified program implemented in response to

27  threats to the safety and security of the institution arising from riots or information that inmates

28  ////

11

1  plan to assault staff." <u>Norwood v. Cate</u>, No. 1:09-cv-0330 AWI SAB, 2013 WL 1127604, *23

2  (E.D. Cal. Mar. 18, 2013).

3                    **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

4           The parties to this proceeding are plaintiff Rex Chappell and defendants Pliler, Rosario,

5  Stiles, Goughnour, and Vance.  Plaintiff was incarcerated at CSP-Sacramento and housed on both

6  A and B Facilities at all times material to the matters at issue.  Defendants worked for the

7  California Department of Corrections and Rehabilitation (CDCR) and were assigned to CSP-

8  Sacramento in the following positions: defendant Pliler was the Warden; defendant Rosario was

9  the Chief Deputy Warden; defendants Stiles and Goughnour were Associate Wardens; and

10 defendant Vance was a Facility Captain.  (Defendants' Statement of Undisputed Facts ("DSUF")

11 ¶¶ 1-2 (ECF No. 88-2).)  Defendants' Statement of Undisputed Facts is supported by the

12 following evidence:

13         • an abstract of judgment for the convictions for which plaintiff was incarcerated in

14           2002 (Ex. A to DSUF at pp. A-002 to A-003 (ECF No. 88-3 at 3-4))

15         • CDCR's record of plaintiff's movement history during the time period at issue

16           here (Ex. A to DSUF at pp. A-004 to A-041 (ECF No. 88-3 at 5-42))

17         • plaintiff's prison grievance regarding the issues here (Ex. A to DSUF at pp. A-044

18           to A-056 (ECF No. 88-3 at 45-57))

19         • plaintiff's trust account statement from February 1, 2002 through July 22, 2002

20           (Ex. A to DSUF at p. A-057 (ECF No. 88-3 at 58))

21         • the January 26, 2009 Declaration of S. Vance (Ex. B to DSUF (ECF No. 88-3 at

22           65-69))

23         • a Program Status Report dated January 4, 2002 regarding the attack on that date on

24           officers by 11 inmates (Ex. C to DSUF (ECF No. 88-3 at 71))

25         • the March 21, 2006 Declaration of C. Pliler (Ex. D to DSUF (ECF No. 88-3 at 74-

26           78))

27 ////

28 ////

                                            12

- memoranda from CSP-Sacramento prison officials to staff and inmates regarding the lockdowns and modifications to programs on B-Facility from January 4, 2002 to August 27, 2002 (Ex. E to DSUF (ECF No. 88-4))
- prison records of plaintiff's visitors (Ex. F to DSUF (ECF No. 88-5 at 1-11))
- Incident Report and Memorandum to Staff regarding the May 8, 2002 attack on an officer (Ex. G to DSUF (ECF No. 88-5 at 13-17))
- September 30, 2015 Declaration of J. Ridge (Ex. H to DSUF (ECF No. 88-5 at 19-27))
- October 1, 2015 Declaration of J. Zuber (Ex. I to DSUF (ECF No. 88-5 at 29-30))
- plaintiff's medical records from 2002 (Ex. J to DSUF (ECF No. 88-5 at 32-49))

**I.     Background re CSP-Sacramento**

Each of California's thirty-three prisons are categorized in one of four security levels, depending on the security risk posed by the inmates confined in the given prison.  Since its creation, CSP-Sacramento has been a Level IV prison, a maximum security prison, because the inmates confined at that institution are deemed to pose the greatest threats to institutional security and safety of staff.  CSP-Sacramento is organized into three identical sets of buildings – Facilities A, B, and C.  Each facility is comprised of eight blocks, and each block consists of 64 cells and 128 beds. At CSP-Sacramento, each facility is self-contained and built around a yard where, absent unusual conditions, inmates are allowed access for daily outdoor exercise.  (DSUF ¶¶ 3-5, 8.)

During 2002, approximately 1,000 prisoners were confined in each of the three facilities at CSP-Sacramento.  The prisoners in each facility were of all races and ethnic groups.
On January 4, 2002, an inmate assault on staff began a two-year period of "unprecedented violence" at CSP-Sacramento.  Continued inmate-on-staff assaults, as well as ongoing ethnic and gang violence, caused prison administrators at CSP-Sacramento to suspend normal programming. (DSUF ¶¶ 6-7, 9.)

////

////

13

**II.**     **Events at CSP-Sacramento's B-Facility from January through August 2002**

**A.   Initial Events Leading to Lockdowns and Modified Programming**

On the morning of January 4, 2002, in the B-Facility dining hall, Officer Haggard was attempting to counsel inmate Lopez, when Lopez began to assault Officer Haggard. Officer Casey responded, while Officer Higgins attempted to calm four other inmates in the vicinity. The four inmates pushed Officer Higgins, and then joined in the assault on Officers Haggard and Casey. Two additional inmates then joined in the assault. Inmate Lopez ran toward Officer Frasier and began hitting him, while three more inmates joined Lopez in that assault. Two more inmates began striking officers and throwing objects at them. Rounds were fired to put an end to the assault. (DSUF ¶ 10.)

Several staff members were transported to Mercy Hospital. Three of the four officers involved in the assault received puncture wounds; the type associated with inmate manufactured weapons. Officer Haggard was hospitalized in the intensive care unit. A subsequent search of the area uncovered two weapons. (DSUF ¶¶ 10-12.)

A state of emergency was declared and the institution was placed on lockdown status. During a lockdown, inmates are confined to their cells. Inmates are allowed to exit their cells only for controlled showers or some medical appointments. On January 4, 2008, all staff and inmates on B-Facility were notified of the program changes. (DSUF ¶¶ 13-15.)

Initially, all normal programming activities for prisoners within the entire institution were discontinued, including yard, showers, visiting, work and education programs, access to the law library, canteen, telephone privileges, and group religious services. Although inmates could not visit the law library, they could forward requests for legal reference materials to the Librarian through housing unit staff. Medical Technical Assistants (MTAs) made rounds throughout the housing units, and any inmate who required emergency medical services was sent to the clinic for treatment and medications. (DSUF ¶¶ 16-18.)

**B.   Gradual Reinstatement of Programming**

On January 8, 2002, inmates on B-Facility were allowed controlled showers. Inmates were to be escorted in handcuffs, one cell at a time, with two officers escorting each inmate. On

January 10, 2002, Warden Pliler authored a memorandum requiring that all inmates within the institution be placed in restraints when escorted within the facility.  Inmates housed in cells with "cuff ports" were placed in handcuffs and escorted to and from showers.  Inmates housed in units without "cuff ports" in the doors were released one at a time without restraints.  All inmates being escorted between facilities were in full restraints, including waist chains and leg irons.  Officers were not allowed into housing units with unrestrained inmates.  (DSUF ¶¶ 19-21.)

On January 18, 2002, B-Facility inmates were approved for attorney visits, and linens were exchanged at the cell doors.  All other restrictions remained in effect.  (DSUF ¶ 22.)

Plaintiff met with his attorney, Michael Rooney, on January 27, 2002.  (DSUF ¶ 23.)

Clothing exchanges for B-Facility inmates began on January 22, 2002.  Inmates could exchange their dirty clothing for clean clothes by passing their laundry through the tray slot on a weekly basis.  By February 4, 2002, inmates on B-Facility were allowed access to the canteen, and could purchase up to two books of stamps, envelopes, stationary, pens, and pencils.  On March 1, 2002, the number of items an inmate could purchase was limited to ensure there would be an adequate supply for each inmate.  On March 5, 2002, inmates on B-Facility could purchase hygiene items.[1]  (DSUF ¶¶ 24-27.)

Programming began to be reinstituted for "critical workers" on B-Facility on March 8, 2002.[2]  Those inmates were initially allowed to work and had some yard, telephone, and visiting privileges.  This release of approved workers comprised approximately ninety-five inmates in B-Facility.  Also starting on March 8, chaplains conducted rounds for inmates who wanted to receive services at their cell doors, and inmates assigned to mental health groups were ducated for treatment in B-5 block.  On March 19, executive body members of the Men's Advisory Committee ("M.A.C.") were allowed yard time.  (DSUF ¶¶ 28, 29.)

---

[1] Defendants list the date for the purchase of hygiene items as March 1.  However, the exhibits attached to the DSUF show that the first memorandum allowing the purchase of hygiene items from the canteen is dated March 5, 2002.  (See Ex. E to DSUF at p. E-012 (ECF No. 88-4 at 13).)

[2] Defendants state this date as March 10.  However, the memorandum re-instituting work, some yard access, telephone, and visiting for critical workers is dated March 8.  (See Ex. E to DSUF at pp. E-013 to E-014 (ECF No. 88-4 at 14-15).)

15

On March 27, 2002, all inmates on B-Facility could receive quarterly packages.  Only Hispanic inmates were required to be in restraints during escorts.  (DSUF ¶ 30.)

On April 3, 2002, inmate yard time on B-Facility was approved according to a schedule, and all inmates, except Hispanics, were allowed Saturday and Sunday visiting.  Plaintiff, who was designated as an African-American, non-affiliated inmate at the time, was in the group of inmates allowed yard time according to a schedule.  At that point, it had been approximately 89 days since plaintiff had outdoor exercise.  (DSUF ¶ 32.)

### C.  New Incidents Result in Reinstitution of Restrictions for Some Inmates

On April 14, based on "tension in the yard among inmates belonging to the Crips disruptive group," members of the Crips gang were required to be escorted in small groups, though without restraints.  Work and educations groups, yard, law library, religious services, telephone, and family visits were discontinued for Hispanics, L.A. Crips, and White inmates, but programming was normal for all other inmates.  This did not affect plaintiff, who was designated as non-affiliated in 2002.  (DSUF ¶¶ 33, 34.)

On April 15, 2002, a stabbing assault involving White inmates occurred on the main exercise yard.  Canteen and visiting were discontinued for Southern Crips and White inmates. (DSUF ¶ 35.)

### D.  Programming Restrictions Lifted for Most Inmates, Including Plaintiff

By May 2, 2002, about four months after the lockdown began, programming returned to normal for all inmates on B-Facility except the Southern Hispanic inmates.  Inmates were allowed yard privileges subject to an approved yard schedule.[3]  (DSUF ¶ 36.)

### E.  Second State of Emergency Declared

On May 8, 2002, a Black inmate stabbed a Correctional Officer in the B-Facility dining hall, and a state of emergency was imposed.  The officer received injuries consisting of puncture

////

---

[3] Defendants state this date as May 1. While the memorandum lifting restrictions is dated May 1, the memorandum states that its effective date is May 2, 2002.  (Ex. E to DSUF at p. E-047 (ECF No. 88-4 at 48).)

1   wounds to the head and neck areas.  B-Facility returned to modified program status, with all

2   programs canceled for all inmates.  (DSUF ¶ 37.)

3       On May 31, 2002, Acting Warden Rosario announced the state of emergency unlock criteria

4   for B-Facility.  Any inmates with a disciplinary violation for staff assault within the five previous

5   years were excluded from the unlock, as were inmates who had violations for possession of

6   weapons for the prior three years, inmates who participated in a riot or battery on an inmate

7   within the past two years, and any inmate who was disciplined for possession or for being under

8   the influence of inmate-manufactured alcohol.  The remaining inmates would be dispatched to a

9   job assignment without consistent gun coverage.   (DSUF ¶ 38.)

10      On July 2, 2002, inmates on B-Facility were allowed to be escorted without restraints.[4]

11  Visiting, telephone, quarterly packages, and canteen privileges were returned to normal, and three

12  M.A.C. members were approved to communicate with inmates from block to block.  Some

13  inmates, a group that did not include plaintiff, began to be approved for work and yard time

14  starting on July 10, 2002.  (DSUF ¶¶ 39, 40.)

15      By July 16, 2002, Black inmates were the only prisoners who were still being escorted.  Black

16  inmates were also restricted to the law library paging system, while all other inmates were

17  allowed library access.  (DSUF ¶ 41.)

18      **F.   Additional Violence and Restrictions**

19      On August 8, 2002, a White inmate was stabbed on the main exercise yard, and privileges

20  were suspended for the White inmates.  Black inmates continued with a restricted program.

21  (DSUF ¶ 42.)

22      On August 15, 2002, a significant amount of metal stock was discovered missing from B-

23  Facility dining halls.[5]  (DSUF ¶ 43.)

24  ////

---

25  [4] Again, defendants list the memorandum date of July 1 rather than the effective date of July 2,
26  2002.  (Ex. E to DSUF at p. E-056 (ECF No. 88-4 at 57).)

27  [5] Defendants include a statement in this paragraph that "[b]ecause the metal could be fashioned
    into inmate-manufactured weapons, programs on B-Facility were again suspended."  However,
28  the memorandum cited by defendants does not include that reasoning.

1    On August 22, 2002, two additional incidents occurred involving White and Hispanic

2    inmates, and programs on B-Facility remained suspended.  (DSUF ¶ 44.)

3    On August 27, 2002, Black inmates and those inmates classified as "Others" were approved

4    for work and education assignments, canteen, religious services, and yard.[6]  Programs remained

5    suspended for the remaining B-Facility inmate population.  (DSUF ¶ 45.)

6    On August 28, 2002, plaintiff  was transferred to the Security Housing Unit (SHU) at

7    California State Prison - Corcoran (CSP-Corcoran).  (DSUF ¶ 46.)

8    **III.    Reasons for Lockdowns and Bases for Returning to Normal Programming**

9    The entire process of unlocking a facility following a lockdown is time consuming. In 2002,

10   the main goal was to return to normal programming as quickly as possible, while ensuring staff

11   and inmate safety.  (DSUF ¶ 47.)

12   During a gradual unlock process, staff members conducted interviews with all inmates,

13   searched all areas of the prison, and followed up on all information and evidence that was

14   obtained.  The process was both time and labor intensive.[7]

15   After the January 4, 2002, assault on staff, there were approximately 1,000 inmates assigned

16   to B-Facility.  All inmates were interviewed, or attempted to be interviewed.  Any information

17   received from the inmates during the interviews was followed up and investigated.  The

18   information collected was shared with other institutions by way of Incident Reports.  The Incident

19   Reports were sent to CDCR Headquarters and to the Law Enforcement Investigative Unit (LEIU)

20   for tracking purposes. LEIU then advised the Director of any patterns of inmate violence

21   occurring state wide.  (DSUF ¶¶ 49-51.)

22   ////

---

23   [6] According to defendants' exhibit E, yard access for Black inmates did not go into effect until

24   August 28 or 29, depending upon their classification.  (Ex. E to DSUF at p. E-074 (ECF No. 88-4

25   at 75).)

26   [7] In paragraph 48, defendants state that the "process at CSP-Sacramento took several weeks to

27   complete."  However, the citation given, to paragraph 11 of the declaration of defendant Pliler does not support that statement.  (See Ex. D to DSUF, ¶ 11 (ECF No. 88-3).)  In his declaration, defendant Vance, then the Captain of B-Facility, stated that investigations took a month.  (Ex. B

28   to DSUF, ¶ 16 (ECF No. 88-3 at 67).)

Because the January 2002 attack involved Southern Hispanic inmates, staff investigated the possibility that the attacks were ordered by the Mexican Mafia prison gang out of Pelican Bay State Prison (PBSP).  Staff at CSP-Sacramento communicated with staff at PBSP and other institutions, comparing information and verifying possible leads.  Inmates at PBSP were also interviewed in an attempt to gather any pertinent information.  (DSUF ¶ 52.)

During this time, staff were also occupied with searches.  Every cell was searched, as were all common areas of the prison.  To ensure there were no weapons out on the yard, the yard was dug up.  (DSUF ¶ 53.)

After interviews and searches were completed, a determination was made by administrative officials as to whether those inmates who were not considered a threat to the safety and security of the institution could return to regular programming.  Typically, groups not involved in the incident precipitating the declaration of a state of emergency are the first inmates to be returned to regular programming.  Once the process is completed without incident, further regular programming was allowed.  (DSUF ¶¶ 54, 55.)

If an incident occurred during the unlock period, a decision had to be made whether to continue the return to regular programming.  Changes to the plan were made based on a determination of whether the new incident was related to the original occurrence that initially led to the state of emergency being declared.  (DSUF ¶ 56.)

Between January 2002 and September 2002, there were two separate staff assaults on B-Facility.[8]  Following each incident, the decision was made to place B-Facility back on modified program status pending further investigation.  After each investigation was completed, administrative officials determined when it was safe to return inmates to normal programming.  (DSUF ¶ 57.)

////

---

[8] Defendants state in paragraph 57 that there were "three separate staff assault on B-Facility" during that time period.  However, the citations to the declarations of defendants Vance and Pliler mention two, not three, attacks on staff in B-Facility.  (See Ex. D to DSUF, ¶ 15 (ECF No. 88-3 at 76-77); Ex. B to DSUF, ¶ 27 (ECF No. 88-3 at 68).)  The third attack on staff occurred in C-Facility.  (Ex. B, ¶ 27.)

Prison officials were faced with a very serious and volatile situation. Staff members were being attacked and inmates continued their racial or gang related wars at every opportunity. The safety risk during this time was one of the highest Warden Pliler had ever seen.[9]  (DSUF ¶ 58.) As a result, inmates at CSP-Sacramento were generally not permitted outdoor exercise in the main yard, the small yards, or in any common area because the risk of violence and injury was too high.  In certain instances, Warden Pliler approved the use of one or more of the small yards within the main yards as areas for inmates to exercise during modified programming, but only when she was sure that inmates would not assault one another.  But even when inmates were allowed to go to the small yards, they continued the violence against each other.  (DSUF ¶¶ 58-60.)

**IV.     Plaintiff's Housing During this Time Period**

Plaintiff was not subjected to all of these lockdowns and modifications to programming.  On April 30, 2002, he was moved from B-Facility to A-Facility, where he remained until May 6, 2002.  Plaintiff returned to B-Facility for ten days, and was then transferred back to A-Facility and placed into administrative segregation for blocking the view into his cell.  A-Facility was not affected by the modified programming.  (DSUF ¶ 61.)

Plaintiff was released out to court on August 26, 2002, and then transferred to California State Prison – Corcoran (CSP-Corcoran) on August 28, 2002.  (DSUF ¶ 62.)

**V.     Plaintiff's Access to Basic Necessities During Lockdown**

**A.  Access to Adequate Food**

During the lockdowns and modified programming at CSP-Sacramento, all inmates were fed in their cells.  Inmates received two hot meals a day served on paper trays, as well as a sack lunch. The meals served to the inmates during the lockdown and subsequent modified programming met the CDCR daily nutrient requirements, and averaged approximately 3050 calories per day. (DSUF ¶ 63.)

---

[9] The court notes that Warden Pliler was also discussing incidents that occurred later, in October and December 2002, including an incident on December 28, 2002 in which 24 inmates participated in an attack on staff members with weapons.  (See Ex. D to DSUF, ¶¶ 15-18 (ECF No. 88-3 at 76-77).)  Plaintiff left CSP-Sacramento on August 28, 2002.

Plaintiff's medical records indicate that he weighed 200 pounds on January 29, 2002, and 205 pounds on August 7, 2002.  Plaintiff's weight fluctuated between 200 and 208 pounds during the lockdowns and modified programming.  (DSUF ¶ 64.)

**B. Access to Hygiene Items**

All inmates were allowed to shower by January 8, 2002.  Inmates also had access to basic hygiene items.  Inmates who were indigent, or who had run out of items such as toilet paper, soap, or tooth powder could ask for, and receive, those items at state expense.  (DSUF ¶¶ 65, 66.)

Inmates on B-Facility could purchase a limited number of hygiene items from the canteen beginning on March 1, 2002.  Specifically, inmates were allowed to purchase two body care items such as lotion and deodorant; two dental items such as toothpaste and toothbrushes; one hair care item, and one shaving item.  (DSUF ¶ 67.)

Although he had money in his trust account, plaintiff did not make a canteen purchase until March 25, 2002, when he spent $50.00.  On May 20, 2002, plaintiff made a second canteen draw of $45.00, but he returned the items on May 30, 2002.  On May 25, 2002, plaintiff's property was sent to the B-Facility property room so that he could receive his property.  Plaintiff had excess property over the allowable amount, including excess hygiene items.  Plaintiff had twenty-two tubes of toothpaste; twenty full bars of soap;, eight full, and two partial, bottles of lotion; and twenty-four full sticks of deodorant.  Plaintiff was told that the excess hygiene products would have to be mailed out, donated, or destroyed.  (DSUF ¶¶ 68-70.)

**VI.    Plaintiff's Grievance**

On January 29, 2002, plaintiff filed a grievance complaining that Black inmates should not be on lockdown because they were not involved in the incident on January 4, 2002.  Plaintiff complained of the conditions during lockdown, including the lack of outdoor exercise, denial of access to the law library, denial of attorney visits, and denial of canteen for the purchase of food items.  Plaintiff stated that "if their (sic) not gonna (sic) feed any better than they have on these paper trays (which we've seen every meal since January 4, 2004), then they need to run canteen or allow packages, so that we can supplement these inadequate portions that are supposed to be complete."  (DSUF ¶¶ 71-75.)

**PLAINTIFF'S DISPUTED FACTS**

Plaintiff's filings in opposition to defendants' motion for summary judgment fail to comply with Local Rule 260(b).  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial."  Instead, plaintiff has filed a "Declaration in Opposition to the Defendants' Summary Judgment" (ECF No. 98) and an "Opposition to Defendants Statement of Undisputed Facts" (ECF No. 99).  In both documents, plaintiff appears to take issue with statements made in the DSUF.

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to discern whether he denies any material fact asserted in the DSUF. Where he does, the court considers below what evidence plaintiff has offered that may demonstrate the existence of a disputed issue of material fact.

**ANALYSIS**

## I.      Eighth Amendment Claims

### A.   Denial of Outdoor Exercise

#### 1.    Objective Element – Substantial Risk of Serious Harm

The parties dispute the length of plaintiff's deprivation of outdoor exercise.  Defendants stated in their brief that plaintiff was deprived of outdoor exercise for a total of 97 days.  (Defs.' Mot. for Summ. J. at 8 (ECF No. 88-1).)  Plaintiff claims he was deprived of outdoor exercise for eighth months, which would be approximately 240 days.  (Pl.'s Decl. in Oppo. at 5 (ECF No. 98).)  The prison records presented by defendants show that neither party is correct.[10]

////

////

---

[10] In fact, defendants' statement is not supported by their own Statement of Undisputed Facts. They cite paragraph 59 for their calculation of plaintiff's total time under modified programming. However, paragraph 59 is nothing more than a general statement about prison policy during lockdowns.

It is not disputed that plaintiff was classified as a Black non-affiliated inmate in 2002. Defendants' exhibits show that inmates in plaintiff's classification at B-Facility at CSP-Sacramento were denied yard privileges during the following time periods:

- from January 4, 2002 through April 3, 2002 (Decl. of S. Vance, Ex. B to DSUF, ¶¶ 13, 14 (ECF No. 88-3 at 65-69); Lockdown Memos, Ex. E to DSUF, at pp. E-001, E-033 (ECF No. 88-4 at 2, 34)); and

- from May 8, 2002 through August 28, 2002 (Ex. E to DSUF at pp. E-049, E-074 (ECF No. 88-4 at 50,75)).

Plaintiff's simple assertion of an eight-month deprivation, even when made under penalty of perjury, is insufficient to contradict defendants' showing, based on extensive documentary evidence, that yard privileges were available to plaintiff during the period from April 3, 2002 to May 7, 2002.

Defendants also show that plaintiff was not housed on B-Facility during a portion of the time it was under lockdown. Plaintiff does not specifically dispute these facts. Defendants show the following:

- Plaintiff was moved to Administrative Segregation ("Ad Seg") in A-Facility from May 16 to May 20, 2002. (Pl.'s Movement History, Ex. A to DSUF at pp. A-008 to A-009 (ECF No. 88-3 at 9-10).)

- Plaintiff was again moved to Ad Seg in A-Facility from June 17 to July 3, 2002. (Id.)

-  Plaintiff spent the day of May 22, 2002, at a hospital outside the prison. (Id. at p. A-008.)

- Plaintiff spent a second day out of prison when he was taken to court on August 26, 2002. (Id.)

- On August 28, 2002, plaintiff was transferred to Corcoran State Prison.[11] (Id.)

////

---

[11] Defendants also show that plaintiff was moved from B-Facility to A-Facility from April 30 to May 6, 2002. (Pl.'s Movement History, Ex. A to DSUF at p. A-009 (ECF No. 88-3 at 10).) However, yard time was available on B-Facility during that time so it is not relevant to the calculation of the denial of yard time based on the B-Facility lockdown.

1    Thus, by the court's calculation, prison records show that plaintiff was deprived of yard

2    privileges for a total of 88 days during the first lockdown and for a total of 89 days during the

3    second lockdown.[12]

4    Whether plaintiff was deprived of yard time for the 97 days stated by defendants in their brief,

5    the 177 days calculated by the court from prison records, or the approximately 240 days stated by

6    plaintiff, the period of time meets the standard of an objectively serious deprivation.  See Lopez

7    v. Smith, 203 F.3d 1122, 1133 (9th Cir. 2000) (six-week denial of outdoor exercise satisfies the

8    Eighth Amendment's objective requirement); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994)

9    (in-cell confinement for almost 24 hours a day and 45 minutes of outside exercise per week for a

10   6–week period sufficient to meet objective element); Spain v. Procunier, 600 F.2d 189, 199 (9th

11   Cir. 1979) (requiring inmates confined for a period of years be provided outdoor exercise 1 hour

12   per day, 5 days a week).  Defendants make no attempt to argue otherwise.

13           2.   **Subjective Element – Deliberate Indifference**

14   Having determined that plaintiff satisfies the objective element of this Eighth Amendment

15   claim, the inquiry turns to whether defendants were subjectively deliberately indifferent.

16   Determining "deliberate indifference" is a two-part inquiry.  Thomas v. Ponder, 611 F.3d 1144,

17   1150 (9th Cir. 2010) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  First, the inmate

18   must show that the prison officials were aware of a "substantial risk of serious harm" to an

19   inmate's health or safety.  Id.  Second, the inmate must show that the prison officials had no

20   "reasonable" justification for the deprivations, in spite of that risk.  Farmer, 511 U.S. at 844.

21   None of the defendants contend that they were, either individually or as a group, unaware of a

22   "substantial risk of serious harm."  Given the well-established nature of the law requiring outdoor

23   exercise for inmates, the court finds, for purposes of this analysis, that defendants knew of the

24   ////

25   _____

26   [12] It should be noted that these figures may be off by a day or two because it is unclear whether
     days plaintiff was moved should count as time in Ad Seg or as time under the modified

27   programming on B-Facility.  In any event, a day or two difference in the total time is not
     important to the court's analysis herein.

28

1    lengthy restrictions on yard access for inmates in plaintiff's class and therefore were necessarily

2    aware of a substantial risk of serious harm to plaintiff.

3         The only real issue raised by defendants' motion is whether defendants had reasonable

4    justification for the denial of outdoor exercise.  The Ninth Circuit has made clear that prison

5    officials are entitled to wide-ranging deference in making decisions, such as this one, to lock

6    down a prison to prevent violence.  See Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2009);

7    Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011).  The Supreme Court has recognized that

8    prison officials have particular expertise in making these decisions:

9              [T]he problems that arise in the day-to-day operation of a
               corrections facility are not susceptible of easy solutions. Prison
10             administrators therefore should be accorded wide-ranging deference
               in the adoption and execution of policies and practices that in their
11             judgment are needed to preserve internal order and discipline and to
               maintain institutional security.  Such considerations are peculiarly
12             within the province and professional expertise of corrections
               officials, and, in the absence of substantial evidence in the record to
13             indicate that the officials have exaggerated their response to these
               considerations, courts should ordinarily defer to their expert
14             judgment in such matters.

15   Bell v. Wolfish, 441 U.S. 520, 547-48 (1979); see also Norwood, 591 F.3d at 1070 (court should

16   not "micro-manage officials whose expertise in prison administration far exceeds our own").

17        In Norwood, the Court of Appeals considered the lock down at issue here – the 2002 lock

18   down of B-Facility at CSP-Sacramento.  In considering the question of qualified immunity, the

19   Court of Appeals stated that the record before it showed that the "officials' judgment that there

20   was a greater risk of harm from allowing outdoor exercise was certainly reasonable" given the

21   "great deal of violence that took place during outdoor exercise."  591 F.3d at 1070.  The Court of

22   Appeals found the defendants' reasons for imposing the lockdowns were "substantial."  Id. at

23   1069.  The Court of Appeals noted that the plaintiff in that case "offered no evidence that the

24   lockdowns were meant to be punitive or were otherwise implemented in bad faith."  Id.; see also

25   Noble, 646 F.3d at 1147-48 (no evidence in the record that "the lockdown was in excess of what

26   was required to restore order, was unrelated to the officials' security and safety responsibilities

27   and was kept in effect for a longer period than necessary").

28   ////

Defendants in the present case give the same reasons as those discussed by the court in Norwood for imposing the restrictions on outdoor exercise. They claim that the need to preserve institutional security and the safety of prison staff during a time of heightened prison violence justified the denial of yard time. Defendants state that the investigation process was necessarily long because of the large number of inmates interviewed and the different groups of inmates involved in the various acts of violence.

Defendant J. Vance was the Captain of B-Facility at CSP-Sacramento in 2002. At the time he executed his declaration in 2009, Vance had held the position of Facility Captain at CSP-Sacramento for 20 years. (Ex. B to DSUF, ¶ 1 (ECF No. 88-3 at 65).) Vance stated that the January 2002 assault "began a two-year period of unprecedented violence at CSP-Sacramento." (Id. ¶ 9.) After the January 2002 assaults, prison staff found two weapons in the area where the attack had taken place. (Id. ¶¶ 11, 12.) Investigation immediately followed. (Id. ¶ 15.) Prison officials did not know whether the incident was isolated or whether other attacks were planned. (Id.) The investigation took a month. All 1000 inmates on B-Facility were interviewed, or attempted to be interviewed, one at a time. (Id. ¶ 16.) Information received during the investigation resulted in follow-up investigations and staff at other prisons were contacted about the possibility that the attacks were ordered by the Mexican Mafia prison gang. (Id. ¶¶ 17, 18.)

Vance also stated that all cells in B-Facility were searched, as well as all common areas. (Id. ¶ 19.) Officers dug up the main exercise yard to look for weapons. (Id.) Vance stated that the information gathered by staff between January and March 2002 "indicated there was a serious threat to institutional safety." (Id. ¶ 21.) Vance also described the gradual process of re-instituting normal programming. (Id. ¶¶ 22-26, 28.)

Defendant C. Pliler was the warden of CSP-Sacramento in 2002. However, she was absent for a period of about eight months between January 2002 and August 2002. (Ex. D to DSUF, ¶ 2 (ECF No. 88-3 at 74).) During that time, defendant Rosario was the acting warden. (Id.) Warden Pliler also described the serious attacks on staff on January 4, 2002 and May 8, 2002. (Id. ¶¶ 4, 5.) Pliler described the purpose of the lockdowns as a way to complete investigations while keeping inmates and staff safe. (Id. ¶¶ 8, 12.) She further states, though it does not appear

1  that she is referring to the 2002 situation at CSP-Sacramento specifically, that "[t]ermination of a

2  lock down and a return to normal programming could not occur until all perpetrators of the

3  violence were identified and transferred to other Level IV institutions, and a determination was

4  made that it was safe for staff and inmates to return to normal programming."  (Id. ¶ 9.)  Pliler

5  also stated that prior to 2002, "there had not been many life threatening assaults on staff."  (Id. ¶

6  10.)  Because the January and May 2002 attacks were "more than simple assaults," prison

7  officials "took extra precautions and investigated thoroughly to find the causes of these attacks."

8  (Id.)  Pliler described the investigations as "time and labor intensive" but did not estimate the total

9  time they took.  (Id. ¶ 11.)

10     Pliler stated that barring outdoor exercise was an important part of the lockdown because

11  allowing inmates to congregate risked "renewed violence and injuries" to staff and inmates.  (Id.

12  ¶¶ 19, 20.)

13     Plaintiff challenges defendants' description of the time it took to conduct the interviews and

14  searches following the January 2002 violence.  According to plaintiff, all interviews and searches

15  were complete in less than five days.  (Pl.'s Decl. in Oppo. at 2 (ECF No. 98).)  However,

16  plaintiff does not explain how he has personal knowledge of the length of prison officials'

17  investigations.  The court finds plaintiff has failed to show a genuine issue of fact in this regard.

18     Plaintiff also challenges the reasons for the lockdown, or at least for the length of it.  Plaintiff

19  states that defendants Vance, Goughnour, and Rosario told plaintiff, in the presence of about

20  fourteen witnesses, that they knew exactly who was involved in the assault and were only putting

21  all inmates on lockdown and denying them privileges "so that Black's White's and Other Inmates

22  will get mad and assault the Mexican's who stabbed my officers."  (Id. at 1, 4, 5, 7, 8, 11; Pl.'s

23  Oppo. to Defs.' Stmt. Of Undisp. Facts at 1, 3, 4 (ECF No. 99).)  Because plaintiff's filings were

24  made "under penalty of perjury" and because plaintiff states that he was present when defendants

25  Vance, Goughnour, and Rosario explained the reason for the lockdown, the court finds, for

26  purposes of summary judgment, that it creates a factual dispute with the evidence presented by

27  defendants.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[A]t the summary

28  ////

1    judgment stage the judge's function is not himself to weigh the evidence and determine the truth

2    of the matter but to determine whether there is a genuine issue for trial.").

3        In their reply brief, defendants do not address plaintiff's description of the statement made by

4    defendants Vance, Goughnour, and Rosario.  Defendants make no attempt to contradict the

5    statement in any way or challenge its admissibility.  Thus, the undersigned finds that plaintiff has

6    established a genuine issue of material fact on the question of whether the defendants'

7    justification for the denial of outdoor exercise was reasonable.

8        **B.  Denial of Hygiene Items**

9        Plaintiff's argument about the denial of canteen privileges appears to be that he was

10   unable to acquire hygiene supplies.[13]  Defendants have shown that inmates who had run out of

11   items such as toilet paper, soap, or tooth powder could ask for, and receive, those items at state

12   expense during the lockdown.  (Decl. of J. Zuber, Ex. I to DSUF, ¶¶ 4, 5 (ECF No. 88-5 at 30).[14])

13   In fact, once a week an officer would take a cart with toilet paper, soap, and tooth powder from

14   cell to cell and ask each inmate if he needed any of those items.  (Id. ¶ 5.)

15       Defendants also showed that inmates on B-Facility could purchase a limited number of

16   hygiene items from the canteen beginning on March 5, 2002.  (Lockdown Memo, Ex. E to DSUF,

17   at p. E-011 (ECF No. 88-4 at 13).)

18       Plaintiff does not contest defendants' showing regarding the access to basic hygiene

19   supplies during the lockdown.  Rather, in his complaint, plaintiff simply states that he had "long

20   run out of those basic human need items which could only be purchased through the canteen such

21   as toothpaste, deodorant [sic], lotion, grease, and soap." (ECF No. 1 at 9.)   Plaintiff does not

22   state that he was unable to obtain basic hygiene items from the prison.  Further, plaintiff's broad

23   statement that essential items such as soap and toothpaste were only available from the canteen is

24

25   [13] To the extent plaintiff is also arguing that he should have been permitted to purchase food, that
     issue is part of plaintiff's claim that defendants were providing inadequate food during the

26   lockdown.  That claim is addressed in the following section.  To the extent plaintiff is arguing that
     he was denied tobacco products, that issue is discussed below in the final section.

27

28   [14] J. Zuber's declaration is dated October 1, 2015.  It was not presented in support of defendants'
     prior motion for summary judgment.

1   insufficient to create a genuine issue of material fact because no reasonable jury could find in

2   plaintiff's favor on this issue.

3       Defendants have presented the declaration of J. Zuber who was the Housing Unit Sergeant

4   on B-Facility in 2002.  (Ex. I to DSUF, ¶ 2.)  One of his duties was ensuring that correctional

5   officers on B-Facility completed their duties including passing out essential hygiene supplies to

6   inmates who required them during the lockdown.  (Id. ¶¶ 3, 4.)   Zuber states that during 2002

7   lockdowns inmates who needed hygiene items could request them, "and they would be provided

8   at state expense."  (Id. ¶ 4.)  In addition, one night each week, officers would go cell to cell with a

9   cart containing toilet paper, soap, and tooth powder for any inmate who needed those items.  (Id.

10  ¶ 5.)  Defendants have shown that inmates had access to soap, tooth powder, and toilet paper as

11  needed during the lockdown.  Plaintiff's statement that soap and tooth paste were only available

12  from the canteen is unsupported.  Moreover, plaintiff has not stated that the soap and tooth

13  powder provided to all inmates were, for some reason, unavailable to him.  The court finds

14  plaintiff has failed to establish a genuine issue of material fact that he was denied one of these

15  items.  However, because plaintiff's claim includes more than a denial of only soap and

16  toothpaste, a question remains about just what hygiene items the prison was required to supply

17  inmates.

18      Case law in this circuit establishes that a prisoner has a right to the hygiene items which

19  reflect "the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337,

20  347 (1981).  It does not appear, however, that any court has narrowed down just what hygiene

21  items must be provided during a long-term lockdown such as that faced by plaintiff.  In fact, a

22  court considering a short-term denial of soap, toilet paper, toothpaste, and a toothbrush recently

23  noted that cases finding the denial of these items stated an Eighth Amendment violation are

24  distinguishable because in those cases the plaintiffs also alleged additional deprivations, such as

25  inadequate heat.  See Mitchell v. Cate, No. 2:11-cv-1240 JAM AC P, 2015 WL 5255339 (E.D.

26  Cal. Sept. 9, 2015) (collecting cases).

27      Defendants have shown plaintiff had access, if he chose, to state-provided soap,

28  toothpowder, and toilet paper.  Plaintiff  has not alleged his living conditions were otherwise

1  unsanitary or shown that additional supplies such as deodorant and lotion were constitutionally

2  required.  Therefore, this court concludes that plaintiff fails to establish the first part of an Eighth

3  Amendment claim – that he was at a substantial risk of serious harm due to the deprivation of

4  hygiene supplies because he fails to show he was deprived of constitutionally required hygiene

5  supplies.

6      **C. Denial of Adequate Food**

7      In his complaint, plaintiff alleged that he was fed only two cold meals a day for an

8  indeterminate amount of time which he refers to as "some time" or "for a while." (ECF No. 1 at

9  9.)  In his opposition to defendants' motion, plaintiff now claims that he was fed only two cold

10  meals a day during the entire period of the lockdown.  (Pl.'s Decl. in Oppo. at 2, 6, 8, 12 (ECF

11  No. 98).)  He further now contends that some of those meals, apparently those served after 63

12  days, consisted of only an apple and frozen lunchmeat.  (Id. at 2, 6.)  In his opposition to

13  defendants' prior summary judgment motion, plaintiff alleged that he lost nearly thirty pounds

14  and experienced stomach pains and dizziness during the lockdown periods because of the lack of

15  adequate food.  (ECF No. 54 at 17-18, 30.)  In his current opposition documents, plaintiff does

16  not repeat these allegations of injury as a result of the meals.  However, because plaintiff is pro se

17  and because the court must draw all reasonable inferences in plaintiff's favor, the court will

18  assume plaintiff maintains his allegations that he suffered weight loss, stomach pain, and

19  dizziness.

20      In their motion, defendants focus on just one factor of the Eighth Amendment analysis –

21  whether plaintiff was subjected to a substantial risk of serious harm.  Because defendants do not

22  seek judgment on the issue of deliberate indifference, the second factor in the Eighth Amendment

23  analysis, the court does not address it here.

24      Defendants have shown that prisoners during the lockdown were given three meals per day –

25  two hot meals and one cold meal.  (Decl. of J. Ridge, Ex. H to DSUF, ¶ 5 (ECF No. 88-5 at 20).)

26  They have also shown that the meals provided "were in compliance with CDCR's nutritional

27  guidelines" and averaged 3050 calories per day.  (Id. ¶¶ 6, 8, 9.)  However, defendants have not

28  presented any evidence showing that plaintiff in fact received these meals.  Further, the court

1  notes that while defendants state that all programming returned to normal on May 2, the

2  lockdown memorandum issued May 1, 2002, which lifted most restrictions, states that meals

3  would continue to be served in cells.  (Ex. E to DSUF at pp. E-047 (ECF No. 88-4 at 48).)  It

4  appears that meals were served to inmates in their cells throughout the time period from January

5  4, 2002 when the lockdown began to August 28, 2002, when plaintiff was transferred out of CSP-

6  Sacramento.

7       Defendants do show that plaintiff did not lose thirty pounds.  Plaintiff's medical records

8  provided by defendants show that plaintiff weighed 200 pounds on January 29, 2002, shortly after

9  the beginning of the lockdown, and that he weighed 205 pounds on August 7, 2002, shortly

10  before plaintiff was transferred out of CSP-Sacramento.  (Pl.'s Medical Records, Ex. J to DSUF

11  (ECF No. 88-5 at 45, 47).)

12       The provision of cold food is not a deprivation sufficient to constitute cruel and unusual

13  punishment.  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).  However, the sustained

14  provision of nutritionally inadequate food can be an Eighth Amendment violation.  See

15  Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002) (food provided must be "nutritionally

16  adequate") (citing Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir. 1980)); Hutto v. Finney, 437

17  U.S. 678, 683, 686-87 (1978) (remarking that conditions of confinement that included a 1000–

18  calorie–per–day diet of "'grue,' a substance created by mashing meat, potatoes, oleo, syrup,

19  vegetables, eggs, and seasoning into a paste and baking the mixture in a pan,". . . "might be

20  tolerable for a few days and intolerably cruel for weeks or months").  While plaintiff has not

21  shown that two cold meals per day amounts to a serious deprivation, he has stated, under penalty

22  of perjury, that he was given only an apple and a piece of frozen lunchmeat twice a day for a

23  period of time near the end of the lockdowns.  This statement creates an issue of fact regarding

24  the food plaintiff was provided during the lockdowns.  Further, even if plaintiff's allegation of

25  weight loss is not tenable, he has alleged he suffered stomach pains and dizziness, which is

26  sufficient to show an actual injury from the deprivation of food.  Given the courts obligation to

27  construe plaintiff's case liberally and to draw all inferences, for purposes of this motion for

28  summary judgment, in plaintiff's favor, the undersigned finds plaintiff has presented sufficient

1    evidence to establish a genuine issue of material fact as to whether he received sufficient nutrition

2    between January 4, 2002 and August 28, 2002.

3        **II.        First Amendment Claims**

4        Defendants' evidence establishes that on January 18, 2002, prison officials lifted restrictions

5    on attorney visits for all inmates and that on January 27, 2002, plaintiff met with his attorney.

6    (Lockdown Memo, Ex. E to DSUF at p. E-005 (ECF No. 88-4 at 6); Pl.'s Visiting Log, Ex. F to

7    DSUF at p. 6 (ECF No. 88-5 at 7).)  In addition, defendants' evidence demonstrates that plaintiff

8    was provided with intermittent access to the law library during the lockdowns and that during

9    total lockdown periods, all inmates could forward requests for legal reference materials to the

10   librarian through housing unit staff.  (Lockdown Memos, Ex. E to DSUF (ECF No. 88-4).)  Given

11   this evidence, the burden shifts to plaintiff to establish the existence of a genuine issue of material

12   fact precluding summary judgment in defendants' favor.

13       The court has considered plaintiff's complaint as well as his filings in opposition to the past

14   and the pending motions for summary judgement.  The undersigned finds that plaintiff has failed

15   to submit any evidence supporting his claim of denial of access to the courts.  In his complaint,

16   plaintiff alleges that he was forced to settle two cases because of the lockdowns, but he does not

17   provide any evidence or information in support of the allegation, such as the type of the cases in

18   question or the posture of the cases at the time he allegedly entered the settlements he claims to

19   have been forced into.  See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("the underlying

20   cause of action, whether anticipated or lost, is an element that must be described in the complaint

21   . . . ."); Lewis v. Casey, 518 U.S. 343, 351 (1996) (plaintiff must show actual injury, there is no

22   "abstract, freestanding right to a law library or legal assistance").

23       In his opposition to defendants' prior motion for summary judgment, plaintiff had alleged the

24   loss of a "nonfrivolous" or "arguable" case as a result of the lockdowns but he failed to provide

25   any evidence that defendants' actions caused his alleged deprivation or that he suffered any

26   "actual injury."  The undersigned adopts Judge Drozd's analysis on this issue from the prior

27   findings and recommendations:

28   *////*

Plaintiff merely argued that he was forced to settle <u>Chappell v. Henry</u>, No. CIV S-99-1454 FCD JFM P and <u>Chappell v. Gaitonde</u>, No. CIV S-99-0235 LKK JFM P for "little or nothing" when he could have prevailed at trial but for the lockdowns. In <u>Chappell v. Henry</u>, No. CIV S-99-1454 FCD JFM P, plaintiff was represented by counsel. To the extent that plaintiff claims that he did not have access to his attorney or access to the law library and that the lockdown conditions forced him to settle that case, his claim is unsupported by any evidence. It is true that plaintiff has submitted a letter written by his attorney Michael Rooney to defense counsel in Case No. CIV S-99-1454 FCD JFM P, in which attorney Rooney states that defense counsel improperly contacted plaintiff, provided him with analyses regarding the case and pressured plaintiff into a settlement agreement after the discussion. (Pl.'s Opp'n Ex. H.) However, even assuming that the events described in attorney Rooney's letter took place, the settlement was reached and the court entered judgment in Case No. CIV S-99-1454 FCD JFM P well before defendants imposed the initial lockdown at CSP-Sacramento on January 4, 2002. <u>See Chappell v. Henry</u>, No. CIV S-99-1454 FCD JFM P (Judgment Entered Oct. 19, 2001).

Similarly, to the extent plaintiff claims that the lockdowns forced him to settle his claims in <u>Chappell v. Gaitonde</u>, No. CIV S-99-0235 LKK JFM P, court records as well as the evidence presented in this case demonstrate otherwise. As early as April 6, 2001, well before the initial lockdown was imposed at CSP-Sacramento, plaintiff (not the defendants) moved the court for a court-ordered settlement. On April 30, 2002, in the midst of the lockdown, plaintiff moved the court to schedule a trial confirmation hearing and informed the court that he had already attempted to settle the case on three occasions. Finally, on September 17, 2002, nearly a month after plaintiff had been transferred to Corcoran State Prison and was no longer subject to the lockdown conditions at CSP-Sacramento, plaintiff signed a settlement agreement and voluntarily dismissed the action in question by stipulation. Even if plaintiff's intermittent access to the law library and to the paging system at CSP-Sacramento were inadequate, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" <u>Lewis</u>, 518 U.S. at 351. A review of Case No. CIV S-99-0235 LKK JFM P demonstrates that plaintiff had more than a sufficient opportunity to present his claims in court. In fact, his case was proceeding to trial on February 3, 2003, long after he transferred to Corcoran State Prison, but plaintiff chose to voluntarily settle the matter. This was not a case, for example, where plaintiff was unable to file a complaint or unable to comply with a court order because of limited access to the library. <u>Lewis</u>, 518 U.S. at 351.

(June 11, 2009 Findings and Recom. (ECF No. 55) at 21-22.)

////

33

1    In his current filings in opposition to the pending summary judgment motion, plaintiff states

2    only: (1) that there was "no paging system" (Pl.'s Oppo. to Defs.' Stmt. of Undisp. Facts at 2

3    (ECF No. 99); Pl.'s Decl. in Oppo. at 16 (ECF No. 98)); (2) that there were no inmates in the law

4    library to "fill all the paging orders that poured in," (ECF No. 98 at 13); (3) that he was denied

5    attorney visits when he was preparing for a criminal trial and "was going to court facing 25 yrs to

6    life" (ECF No. 99 at 3; ECF No. 98 at 14); (4) that there was no law library access because the

7    librarian was busy making bag lunches (ECF No. 98 at 3); and (5) that prisoners did not have

8    access to paper, envelopes, or photocopying (id. at 14). Again, plaintiff fails to allege that he

9    suffered any injury as a result of limitations on access to legal supplies, the law library, or his

10   attorney.  Accordingly, as Judge Drozd did previously, the undersigned recommends defendants'

11   motion for summary judgment be granted with respect to plaintiff's First Amendment claims.

12   **III.    Qualified Immunity**

13   Because the court finds above that defendants are entitled to summary judgment on plaintiff's

14   claims made under the First Amendment and on plaintiff's Eighth Amendment claims for hygiene

15   supplies, the court considers the issue of qualified immunity only with respect to plaintiff's

16   remaining claims under the Eighth Amendment regarding the restrictions on outdoor exercise and

17   adequate food.

18   Defendants argue that even if plaintiff has established a genuine issue of material fact in his

19   Eighth Amendment claims, they are entitled to qualified immunity because reasonable officials in

20   the positions of these defendants could have believed the imposition of restrictions in response to

21   prison violence was consistent with the Eighth Amendment because there was no clearly

22   established law to the contrary.  Defendants rely upon the Ninth Circuit's determinations that

23   defendants were protected by qualified immunity in Norwood and Noble.  As discussed above,

24   the lockdowns at issue in Norwood include the lockdowns at issue in the present case.  Therefore,

25   the court examines Norwood in detail.

26   Plaintiff Gregory Norwood was an inmate on B-Facility at CSP-Sacramento in 2002.  He

27   brought a § 1983 action alleging that prison officials violated his Eighth Amendment rights by

28   denying him outdoor exercise starting in January 2002 for periods of two, three, and four months

34

over two years.  Norwood, 591 F.3d at 1065.  The court in Norwood had the same evidence of violence on B-Facility presented here – the January 2002 attack on four correctional officers by eleven Hispanic inmates and the May 2002 stabbing of an officer by a Black inmate in the dining hall.  The court in Norwood, also considered evidence of subsequent violence in late 2002 and September 2003.  Id.  Thus, the lockdowns considered by the Norwood court between January and August 2002 are the same as those considered by in the present case.

Norwood's case was tried before a jury.  The jury found defendants violated Norwood's Eighth Amendment right to outdoor exercise, but concluded that Norwood suffered no harm.  They awarded nominal compensatory damages and $39,000 in punitive damages.  Id. at 1066.

On appeal, the Ninth Circuit first held that the district court's refusal to give a jury instruction regarding deference due prison officials' decisions was prejudicial error.  Id. at 1067.  The court did not remand for a new trial, however, because it further found that the defendants were entitled to qualified immunity.  Id. at 1067-68.  The court considered the following question:  "'whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'"  Id. at 1068 (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001)) (emphasis added by Norwood court).

The Ninth Circuit considered three factors in its qualified immunity analysis.  First, the court looked to the situation confronting the defendants.  Id.  The court found that defendants had "substantial reasons for imposing the lockdowns: They were attempting to restore order during a series of brutal attacks, some lethal or nearly so. . . .  [P]laintiff offered no evidence that the lockdowns were meant to be punitive or were otherwise implemented in bad faith."  Id. at 1069.

Second, the court recognized the duty of prison officials to keep inmates safe.  Id.  "Officials must balance this imperative against other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control."  Id.

Finally, the Ninth Circuit stressed the "'wide-ranging deference'" due prison officials "when balancing the obligation to provide for inmate and staff safety against the duty to accord inmates

1    the rights and privileges to which they are entitled." Id.  In conclusion, the Ninth Circuit held that

2    a reasonable officer could have believed that restricting outdoor exercise in this situation was

3    consistent with the Eighth Amendment because there was no authority to the contrary.  Id. at

4    1070.

5          As discussed above, there is a genuine dispute about the reasons for the lockdowns.  Plaintiff

6    states that defendants Vance, Goughnour, and Rosario told plaintiff, in the presence of about

7    fourteen witnesses, that they knew exactly who was involved in the assault and were only putting

8    all inmates on lockdown and denying them privileges "so that Black's White's and Other Inmates

9    will get mad and assault the Mexican's who stabbed my officers." (ECF No. 98 at 1, 4, 5, 7, 8,

10   11; ECF No. 99 at 1, 3, 4.)  Plaintiff's evidence creates a dispute of material fact in the first step

11   of the qualified immunity analysis set out by the Ninth Circuit in Norwood.  The Ninth Circuit

12   found the purpose of the lockdowns was to restore order after violent attacks.  The court

13   specifically noted that plaintiff Norwood had not provided any evidence to the contrary.

14         Plaintiff's evidence here is just the sort of contrary evidence of bad faith that the court found

15   missing in Norwood.  Thus, plaintiff has met his burden of showing a genuine issue of material

16   fact regarding the applicability of qualified immunity.  Summary judgment for defendants on the

17   defense of qualified immunity is not appropriate for plaintiff's claims regarding the denial of

18   outdoor exercise and of adequate food.

19                                          **OTHER CLAIMS**

20         In addition to the claims addressed above, plaintiff alleges in his complaint that defendants

21   violated his rights under the Fourteenth Amendment's Equal Protection and Due Process Clauses

22   as well as under California Penal Code § 825 and California Code of Regulations Title 15, §

23   3175.  (Compl. at 12-15.)  Plaintiff also appears to allege that defendants violated his rights under

24   the Eighth Amendment by banning tobacco.  (Id. at 13-14.)  In his 2009 findings and

25   recommendations, Judge Drozd noted that defendants did not address these claims in their motion

26   for summary judgment.  In their renewed motion, they again fail to address the claims.   Plaintiff

27   mentions these claims briefly in his filings in opposition to defendants' renewed summary

28   judgment motion.  (See ECF No. 98 at 9; ECF No. 99 at 2, 3.)  However, plaintiff raises nothing

1    new.

2            Despite the fact they were not challenged by defendants in their motion, Judge Drozd

3    determined it was appropriate to address these remaining claims to properly manage the court's

4    docket and to ensure an orderly trial in this action, pursuant to 28 U.S.C. 1915(e)(2)(B)(ii).  The

5    undersigned agrees and adopts the rulings made by Judge Drozd previously as set forth below:

6            The court finds that plaintiff's complaint does not state a
7    cognizable claim under the Fourteenth Amendment Equal
     Protection Clause.  Equal protection is relevant with respect to
8    classifications that impermissibly operate to disadvantage a suspect
     class or improperly interfere with an individual's exercise of a
9    fundamental right.  "[A] classification neither involving
     fundamental rights nor proceeding along suspect lines is accorded a
10   strong presumption of validity."  Heller v. Doe, 509 U.S. 312, 319
     (1993).  The Ninth Circuit has held that "§ 1983 claims based on
11   Equal Protection violations must plead intentional unlawful
     discrimination or allege facts that are at least susceptible of an
12   inference of discriminatory intent."  Byrd [v. Maricopa Co.
     Sheriff's Dept.], 2009 WL 1362941 at *4 [(9th Cir. 2009)] (quoting
13   Monteiro v. Tempe Union High School District, 158 F.3d 1022,
     1026 (9th Cir. 1998)).[15]  In this case, plaintiff merely alleges that
14   prison officials kept him on lockdown status for months while
     allowing other inmates classified as "critical workers" to access to
15   the yard and the canteen.  Plaintiff has not alleged facts
     demonstrating that he is a member of a suspect class in this regard.
16   Rather, he simply alleges in conclusory fashion that this difference
     in treatment "was clearly an equal protection violation."  (Compl. at
17   14-15; Pl.'s SDF at 3-4.)  The Equal Protection Clause "is
     essentially a direction that all persons similarly situated should be
18   treated alike."  City of Cleburne, Tex. v. Cleburne Living Center,
     473 U.S. 432, 439 (1985).  Plaintiff, who admits that he does not
19   have a job, is not "similarly situated" to inmates classified as
     critical workers.  Nor has plaintiff alleged that there was no rational
20   basis for the difference in treatment between non-critical workers
     and critical workers.  Accordingly, plaintiff has failed to allege a
21   cognizable equal protection claim.

22           In addition, plaintiff's complaint does not state a cognizable
     claim under the Fourteenth Amendment Due Process Clause.
23   Specifically, plaintiff has no procedural due process right to a
     hearing to determine whether defendants' decision to impose an
24   emergency prison-wide lockdown was justified.  See Hayward [v.
     Procunier], 629 F.2d [599] at 601-03 [(9th Cir. 1980)]; cf. Johnson
25   v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) ("Because
     confinement to a prison cell does not violate in and of itself any
26   recognized liberty interest of federal prisoners, no hearing was

27   ───────────────────────
     [15] The Ninth Circuit panel's decision in Byrd was taken up for rehearing en banc and reversed.
28   Byrd v. Maricopa Co. Sheriff's Dept., 629 F.3d 1135 (9th Cir. 2011).  The statement quoted in
     the text from the panel decision was not a basis for the reversal.

necessary before imposing 'cell lockdown'"). Insofar as plaintiff seeks to raise a substantive due process claim, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing plaintiff's claims.'" Albright v. Oliver, 510 U.S. 266, 273 (1994). Here, the Eighth Amendment provides the "explicit textual source of constitutional protection" for plaintiff's claims stemming from the challenged lockdowns.

Nor does plaintiff's complaint state a cognizable claim under California Penal Code § 825. That state statute governs an arrestee's appearance before a magistrate judge and states that, after an arrest, an attorney may visit the prisoner upon his request. Cal. Penal Code § 825(b). The provision allows a prisoner to recover up to $500.00 from an officer who refuses to allow such a visit. However, the civil remedy under § 825 by its terms extends only to arrestees, and not to convicted state prisoners.

Plaintiff's complaint also does not state a cognizable claim under the California Code of Regulations Title 15, § 3175. That regulation governs the standards of conduct for inmates and their visitors. See Cal. Code of Regs. tit. 15, § 3175 (a)-(c). However, there is no reported state or federal decision finding that an independent cause of action is authorized by these regulations. Section 1983 provides a cause of action only for violations of the United States Constitution and federal laws. See Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) ("To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress.")

Finally, plaintiff's complaint also does not state a cognizable claim under the Eighth Amendment for the banning of tobacco from prisons. Even if plaintiff used tobacco, the vague and conclusory allegations of his complaint fail to allege any action by defendants causing sufficient harm to establish a constitutional violation in light of contemporary standards of decency. See Hudson [v. McMillian], 503 U.S. [1] at 8 [(19920]; see also, e.g., Lafaele v. Schwarzenegger, No. CIV S-06-1049 FCD DAD, 2008 WL 4532512 at *4 (E.D. Cal. Oct. 8, 2008) (plaintiff's complaint regarding the tobacco ban in state prisons failed to state a cognizable claim under the Eighth Amendment); Larson v. Runnels, No. CIV S-06-1413 ALA, 2008 WL 220377 at *3 (E.D. Cal. Jan 25, 2008) ("there are no court decisions holding that the denial of tobacco products, including snuff, deprives prisoners of their right to be free from cruel and unusual punishment"); Larson v. Runnels, No. CIV S-06-1934 FCD GGH, 2007 WL 2712110 at * 2 (E.D. Cal. Sept. 14, 2007) ("The actions of prison officials in banning tobacco cannot possibly be an Eighth Amendment or Fourteenth Amendment violation."); Owens v. Ayers, No. C 01-3720 SI (PR), 2002 WL 73226 at *3 (N.D. Cal. Jan. 15, 2002) ("It belittles the Eighth Amendment to suggest that a three-month ban on the possession of personal property, such as tobacco and lighters

(which could not be used within the housing unit in any event),
amounts to cruel and unusual punishment.")

(June 11, 2009 Findings and Recom. at 24-27 (ECF No. 55).)

**CONCLUSION**

For the reasons set forth above, the undersigned finds plaintiff has shown a genuine issue of material fact with respect to his Eighth Amendment claims regarding the denial of outdoor exercise and the denial of adequate food, and with respect to the defense of qualified immunity to those claims.   Plaintiff has failed to establish a genuine issue of material fact for his remaining claims.

Accordingly, IT IS HEREBY ORDERED that the findings and recommendations issued on June 11, 2009 (ECF No. 55) are vacated; and

IT IS HEREBY RECOMMENDED that defendants' October 5, 2015 motion for summary judgment (ECF No. 88) be granted in part and denied in part as follows:

1.  Defendants' motion for summary judgement on plaintiff's Eighth Amendment claims regarding the denial of outdoor exercise and adequate food be denied;

2.  Defendants' motion for summary judgment on plaintiff's Eighth Amendment claim for denial of personal hygiene items and First Amendment claims be granted;

3.  Defendants' motion for summary judgment with respect to the defense of qualified immunity be denied;

4.  Plaintiff's Fourteenth Amendment equal protection and due process claims, his state law claims brought under California Penal Code § 825 and California Code of Regulations Title 15, § 3157(a)-(c), and plaintiff's Eighth Amendment claim challenging the banning of tobacco from CSP-Sacramento be dismissed for failure to state a cognizable claim; and

5.  The case proceed solely on plaintiff's Eighth Amendment claims regarding denial of outdoor exercise and adequate food.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

1   after being served with these findings and recommendations, any party may file written

2   objections with the court and serve a copy on all parties. The document should be captioned

3   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

4   objections shall be filed and served within fourteen days after service of the objections.  The

5   parties are advised that failure to file objections within the specified time may result in waiver of

6   the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

7   Dated:  January 23, 2017

8

9
                                                          _____

10                                                        DEBORAH BARNES
                                                          UNITED STATES MAGISTRATE JUDGE
11

12

13

14  DLB:9
    DLB1/prisoner-civil rights/chap1183.msj
15

16

17

18

19

20

21

22

23

24

25

26

27

28